IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PAUL HUNT,

      Plaintiff,

v.                                                  No. 1:16-cv-00272-LF-KK

BOARD OF REGENTS OF THE UNIVERSITY
OF NEW MEXICO; SCOTT CARROLL, M.D., in his
individual and official capacities; JOHN DOE AND
JANE DOE MEMBERS OF THE COMMITTEE
FOR STUDENT PROMOTION AND EVALUATION,
in their individual and official capacities; TERESA A.
VIGIL, M.D., in her individual and official capacities;
PAUL ROTH, M.D., in his individual and official
capacities,

      Defendant.

**DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND
SUPPORTING AUTHORITY**

      Defendants Board of Regents of the University of New Mexico, Scott Carroll, M.D., Teresa A. Vigil, M.D., and Paul Roth, M.D. ("Defendants") move the Court to dismiss the First Amended Complaint ("Complaint") against them pursuant to Fed.R.Civ.P. 12(b)(6) or Fed. R. Civ. P. 56 and as grounds therefor states that the Complaint fails to state a claim against them and they are entitled to judgment as a matter of law.

STATEMENT OF UNDISPUTED MATERIAL FACTS

      1.      Plaintiff posted the statement attached as Exhibit A on his personal Facebook account. Complaint ¶ 10.

      2.      The University of New Mexico School of Medicine has adopted a Social Media Policy, and the University has adopted a Respectful Campus Policy. Affidavit of Sheila Hickey, M.D., attached as Exhibit B, Exhibits 2 and 3.

3. The Committee for Student Promotion and Evaluation issued a letter to Plaintiff on November 15, 2012 outlining the charge against Plaintiff and providing him an opportunity to address the allegations. Affidavit of Sheila Hickey, M.D., Exhibit 4.

4. The Committee for Student Promotion and Evaluation issued a letter to Plaintiff on January 4, 2013. Affidavit of Sheila Hickey, M.D., Exhibit 5. Complaint ¶¶ 16, 17, 18.

5. Plaintiff did not avail himself of the review process provided in the University of New Mexico Promotions and Due Process Policy. Affidavit of Sheila Hickey, M.D., ¶ 5.

ARGUMENT

I. Standards for Motion

In deciding a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6), the court accepts as true all well-pleaded facts, but not legal conclusions. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown-- that the pleader is entitled to relief." *Id.* at 679. Because Defendants Carroll, Vigil and Roth ask the Court to consider some evidence in addition to the allegations of the Complaint, this motion may be a motion for summary judgment. Fed.R. Civ. P. 12(d). Under Fed. R.Civ. P. 56, summary judgment is proper when there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law.

In order to resolve a qualified immunity claim on a motion to dismiss, the court must decide whether the facts that a plaintiff has alleged set forth a violation of a constitutional right and whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). On a motion for summary

judgment, once a defendant asserts a qualified immunity defense, plaintiff must "overcome a two-part burden: plaintiff (1) 'must . . . establish that the defendant violated a constitutional right' and (2) 'must then show that the constitutional right was clearly established.'" *Wilkins v. DeReyes,* 528 F.3d 790, 796-97 (10th Cir. 2008) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007)). Plaintiff cannot establish that Defendants violated his constitutional rights. Therefore, Defendants are entitled to qualified immunity which bars this suit against them.

Finally, Plaintiff's Complaint must comply with the pleading requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In particular, "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 675-76.

II. The Board of Regents And the Individual Defendants in Their Official Capacities Are Not Persons Under Section 1983.

Plaintiff brings this suit against Defendants under 42 U.S.C. § 1983 (Complaint at 1) which provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured." In *Will v. Michigan Dept. of State Police,* 491 U.S. 58 (1989), the Supreme Court held that a State and governmental entities that are considered arms of the State for Eleventh Amendment purposes are not persons under §1983 and therefore cannot be held liable under that statute. *Id.* at 65, 70. Furthermore, the Court held a suit against state officials in their official capacity "is a suit against the official's office" and therefore, not against a person under § 1983. *Id.* at 71. The Board of Regents of the University of New Mexico is an arm of the State of New Mexico. *Williams v.*

3

*Board of Regents of University of New Mexico,* 990 F.Supp. 2d 1121, 1144 (D.N.M. 2014). As such, it is not a person under § 1983 and the Complaint does not state a claim against the Board of Regents. The Board's motion to dismiss should be granted.

III.    Defendants Are Entitled to Qualified Immunity

Defendants Carroll, Vigil and Roth, members of the faculty of the University of New Mexico School of Medicine, are sued in their individual and official capacities. They are entitled to qualified immunity from suit in their individual capacities.

    A.    Defendants Did Not Violate Plaintiff's First Amendment Rights

This case involves the University of New Mexico School of Medicine, a program to train students for the profession of medicine, and the actions of a student in posting to an open Facebook page a statement, using profanity and intemperate language condemning people supporting President Obama, Democratic and Republican candidates, and abortion. Plaintiff claims that he had a First Amendment right to post this statement without any possible sanctions by the School of Medicine. Defendants disagree, and imposed a "professional enhancement prescription," which included an ethics component and a professionalism component. These components included reading and writing assignments and meetings with mentors. A notation of professionalism violation was to be included in the Dean's Recommendation Letter provided to residency programs. However, Plaintiff could petition to remove the notation. Exhibit 5. The prescription does not violate Plaintiff's constitutional rights.

The Supreme Court has decided four major student speech cases, all in primary and secondary school environments. In *Tinker v. Des Moines Independent Community School District,* 393 US. 503 (1969), the Court held that schools could restrict student speech when it was likely to materially disrupt school operations or invade the rights of others. Student speech

4

that was plainly offensive could be restricted without a finding of disruption under *Bethel School District No. 403 v. Fraser,* 478 U.S. 675 (1986). *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260 (1988), held that student speech in a school-sponsored medium could be restricted by school officials if the action were "reasonably related to legitimate pedagogical concerns. *Id.* at 273. Finally, in *Morse v. Frederick,* 551 U.S. 393 (2007), the Court held that schools could restrict student speech that encouraged illegal drug use.

Unlike these cases, Plaintiff's case raises the "constitutional balance" recently identified in a teacher training case, *Oyama v. University of Hawaii,* 813 F.3d 850 (9th Cir. 2015), "between two prerogatives of a public university's professional certification program: promoting open discourse among its students and limiting certification to candidates suitable for entry into a particular profession." *Id.* at 854. The School of Medicine is charged with graduating students who are suitable for the practice of medicine. In furtherance of this charge, the School imposed a professional enhancement prescription on Plaintiff, having found his Facebook post to be unprofessional conduct. The School did not violate Plaintiff's First Amendment rights in taking this action.

As noted in *Tatro v. University of Minnesota,* 816 N.W. 2d 509 (Minn.2012), the Supreme Court held in *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 685-86 (2010), that "school administrators' decisions related to the pedagogical approaches of a professional program—even outside the narrow confines of the classroom – are due decent respect." *Tatro,* 816 N.W. 2d at 516 (internal quotations omitted). Thus, the School of Medicine's actions with respect to Plaintiff's Facebook posts should be given respect and some deference, and the "special characteristics of the school

environment" must be considered in deciding whether Plaintiff's First Amendment rights have been violated. *Morse,* 551 U.S. at 405.

Because Plaintiff is a post-graduate professional school student and his First Amendment claim arises from speech that occurred outside of the University, there is no clearly applicable Supreme Court or Tenth Circuit authority. *Tatro,* however, is closely on point. In that case, the plaintiff was a student in the University of Minnesota's mortuary science program. She posted on Facebook statements that she characterized as "satirical commentary and violent fantasy about her school experience." 816 N.W. 2d at 511. These included posts about dissecting a cadaver. The Minnesota Supreme Court began its analysis by noting that "courts often have applied the *Tinker [v. Des Moines Independent Community School District,* 393 U.S. 503 (1969)] substantial disruption standard, . . . to the regulation of student speech over the Internet." The court declined to do so as it "does not fit the purposes of the sanctions here. The driving force behind the University's discipline was not Tatro's violation of academic program rules created a substantial disruption on campus or within the Mortuary Science Program, but that her Facebook posts violated established program rules that require respect, discretion and confidentiality in connection with work on human cadavers." *Id.* at 520. The Minnesota court adopted the following standard: "[W]e hold that a university does not violate the free speech rights of a student enrolled in a professional program when the university imposes sanctions for Facebook posts that violate academic program rules that are narrowly tailored and directly related to established professional conduct standards." *Id.* at 521.

Several cases in other jurisdictions have discussed the appropriate legal framework for First Amendment claims by students in professional programs. In *Oyama v. University of Hawaii,* 813 F.3d 850 (9th Cir. 2015), a student was denied admission to a student teaching

6

program for statements about disabled students and sexual relationships between underaged students and teachers. The court, after considering the application of student speech cases such as *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988) and public employee speech doctrine from *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968) and its progeny, applied the standard adopted by the *Tatro* court: "The University of Hawaii's decision to deny Oyama's student teaching application did not offend the First Amendment because it related directly to defined and established professional standards, was narrowly tailored to serve the University's foundational mission of evaluating Oyama's suitability for teaching, and reflected reasonable professional judgment." 813 F.3d at 868. *See also Keeton v. Anderson-Wiley,* 664 F.3d 865 (11th Cir. 2011) (university did not violate student's free speech rights in imposing a remediation plan after student in a counselor education program at a Georgia university stated in class and to fellow students outside class that she would attempt to convert homosexual clients to heterosexuality based on her religious beliefs; university officials determined that these statements expressed her intent to violate the code of ethics of the counseling association); *Keefe v. Adams,* 44 F.Supp. 3d 874 (D. Minn. 2014) (state college did not violate First Amendment rights of nursing student removed from program for unprofessional Facebook statements); *Yoder v. Univ. of Louisville*, 526 Fed. Appx. 537 (6th Cir. 2013) (dismissal of nursing student for blogging about a patient did not violate First Amendment rights of nursing student). In all of these cases, the courts recognized that the First Amendment does not require a university to retain students or accept the behavior of students who do not meet standards for professional behavior in statements made in social media or otherwise outside the classroom.

Plaintiff's behavior in his Facebook post violated the standards of the School of Medicine. The School of Medicine teaches students that because of the stature of a physician

7

with his or her patients and the influence that the physician can assert over patients or potential patients, it is essential that physician's personal beliefs must not be broadcast in inappropriate ways and forums. Thus, the School of Medicine appropriately addressed Plaintiff's Facebook post under the University's Respectful Campus Policy which provides:

> Individuals at all levels are allowed to discuss issues of concern in an open and honest manner, without fear of reprisal or retaliation from individuals above and below them in the university's hierarchy. At the same time, the right to address issues of concern does not grant individuals license to make untrue allegations, unduly inflammatory statement or unduly personal attacks, or to harass others, to violate confidentiality requirements, or engage in other conduct that violates the law or University policy.

There is no question that the post violated this policy; the statements are unduly inflammatory and personal attacks.

In addition, Plaintiff's First Amendment rights were not violated because of the mildness of the sanction imposed by the School of Medicine. Courts have considered the seriousness of the actions taken by the school in determining whether a First Amendment violation has occurred. *Doninger v. Niehoff*, 527 F.3d 41, 53 (2d Cir. 2008) (more serious consequence than disqualification from student office because of offensive web blog post might raise constitutional concerns); *Tatro,* 816 N.W. 2d at 524 (student was not expelled or suspended, failing grade in class not violate First Amendment). Here, Plaintiff was also not expelled or suspended. He was given a professionalism enhancement prescription that included exercises, such as rewriting the original Facebook post and writing an apology to classmates, and meetings with mentors in the Medical School.

Plaintiff's First Amendment rights were not violated by Defendants. They are entitled to qualified immunity from his claims.

   B.  Any Constitutional Right Plaintiff May Have Was Not Clearly Established

8

To defeat Defendants' qualified immunity, Plaintiff must also establish that his First Amendment right to post an inflammatory and unprofessional statement on Facebook was clearly established. In determining whether a constitutional right was clearly established for qualified immunity analysis, the Court must look "for Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains." *Lundstrom v. Romero*, 616 F.3d 1108, 1119 (10th Cir. 2010). As stated above, there is no Supreme Court or Tenth Circuit precedent on the issue presented here: whether and under what conditions a professional program at a public university such as the School of Medicine may take action against a student for postings on social media outside the school.

While there have been several cases in other jurisdictions dealing with the regulation of student speech on the Internet, which have generally applied the *Tinker* standard, these cases did not involve professional programs like the School of Medicine. *See, e.g., J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.,* 711 F.Supp.2d 1094, 1107 (C.D.Cal.2010) ("the majority of courts will apply *Tinker* where speech originating off campus is brought to school or to the attention of school authorities"); *Morgan v. Swanson,* 659 F.3d 359, 384 (5th Cir.2011) (suggesting a dichotomy between private speech contemplated in *Tinker* and school-sponsored speech discussed in *Hazelwood)*; *Doninger v. Niehoff,* 527 F.3d 41, 48 (2d Cir.2008) (discussed above); *J.S. v. Bethlehem Area Sch. Dist.,* 569 Pa. 638, 807 A.2d 847, 869 (2002) (school could punish an eighth grade student for creating a threatening website directed at his algebra teacher where the website "created disorder and significantly and adversely impacted the delivery of instruction" at the school); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,* 650 F.3d 915, 930–31 (3d Cir.2011) (concluding that a school district no reasonable substantial disruption could be forecasted after a student created on her home computer a MySpace profile that made fun of her

principal); *Layshock ex rel. Layshock v. Hermitage Sch. Dist.,* 650 F.3d 205, 217 (3d Cir.2011) (concluding that a high school could not punish a student merely because his creation of a "parody" MySpace profile of his principal outside of school).

In fact, cases in other jurisdictions have specifically held that the First Amendment rights of student in a professional program at a public college or university were not clearly established in the relevant time frame. *Keefe v. Adams,* 44 F.Supp. 3d at 889 (action taken in December 2012); *Yoder,* 526 Fed. Appx. at 544-547 (student dismissed in March 2009, but case decided in 2013 finding then that the right was not clearly established).

In short, even if Plaintiff could show that his constitutional rights have been violated, these rights were not clearly established in 2013 when the professionalism enhancement prescription was imposed on him.

IV. Plaintiff's Due Process Rights Were Not Violated

Assuming that Plaintiff has a liberty or any other interest constitutionally protected against deprivation without procedural due process, Plaintiff has been given as much due process as the Fourteenth Amendment requires. In *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84-85, (1978), the Supreme Court established the due process requirements: "The school fully informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment. The ultimate decision to dismiss respondent was careful and deliberate. These procedures were sufficient under the Due Process Clause of the Fourteenth Amendment."

Here, Plaintiff was notified of the concerns of the University that his post violated professionalism standards and was given the opportunity to "prepare a statement regarding the allegations" and present it to the Committee for Student Performance and Evaluation." (Exhibit

4). The letter also stated that violation of the Respectful Campus Policy was grounds for action up to dismissal from UNM. As demonstrated by the Committee's letter of January 4, 2013 (Exhibit 5), the Committee's decision was careful and deliberate. Furthermore, he was given an additional right to request review by the Senior Associate Dean in this same letter. The process given to Plaintiff was sufficient under the Due Process Clause.

V.    Defendants Are Not Liable in Their Official Capacities

Since the Defendants did not violate Plaintiff's constitutional rights in their individual capacities, they are likewise not liable to Plaintiff in their official capacities. As explained in *Jicarilla Apache Nation v. Rio Arriba County,* 376 F.Supp. 2d 1096, 1100 (D.N.M. 2006):

> Because this Court previously granted summary judgment, and in doing so held that the Nation had not produced evidence that the individual Defendants in their individual capacity violated the Constitution . . . , there can be no liability for County or the individual Defendants in their official capacities. There is no underlying constitutional violation.

(Internal citation omitted).

## CONCLUSION

Defendant Board of Regents and other defendants in their official capacities are not persons under Section 1983. The individual Defendants in their individual capacities are entitled to qualified immunity from Plaintiff's claims. His First Amendment rights were not violated and he was given all process due under the Fourteenth Amendment. The First Amended Complaint should be dismissed.

Respectfully submitted,

MONTGOMERY & ANDREWS, P.A.

By: ___/s/ _Walter J. Melendres_____
    Walter J. Melendres
    Carolyn A. Wolf
Post Office Box 2307
Santa Fe, NM 87504-2307
(505) 982-3873
wmelendres@montand.com
cwolf@montand.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey L. Baker
Renni Zifferblatt
20 First Plaza Ctr. NW, Ste. 402
Albuquerque, NM 87102
jeff@bzjustice.com
renni@bzjustice.com

    /s/ Walter J. Melendres
    Walter J. Melendres