**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

PAUL HUNT,

                Plaintiff,

vs.                                        CIVIL NO. 16-272 MCA/KK

BOARD OF REGENTS OF THE UNIVERSITY
OF NEW MEXICO *et. al.*

                Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND SUPPORTING AUTHORITY

### INTRODUCTION

Plaintiff is a medical student at the University of New Mexico School of Medicine ("SOM"). Following the presidential election in November, 2012, Plaintiff posted on his personal Facebook page a statement critical of President Obama's re-election, critical of the Republican party, and critical of abortion. (Motion Exhibit A). Anonymous student(s) complained about the Facebook post to a School of Medicine faculty member, who referred the matter to the School of Medicine's Committee for Student Promotion and Evaluation (CSPE). That committee took steps to "correct" Plaintiff by threatening him with expulsion from the School of Medicine unless he re-wrote the Facebook post to its satisfaction, and unless he agreed to participate in a "personalized academic prescription (professionalism enhancement program) that is currently under development." Under the threat of being expelled from the School of Medicine, Plaintiff did everything which CSPE required. However, after completing the requirements which CSPE imposed, Plaintiff's permanent academic record at the SOM still contains negative references associated with the Facebook matter. (See Motion Exhibit B4). These negative references jeopardize Plaintiff's acceptance into a residency program upon graduation from the SOM. Additionally, CSPE indicated that if Plaintiff engages in "similar" behavior in the future, he can be expelled.

### I.      RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Plaintiff admits Defendants' facts 1-3 (Motion at 1-2). Plaintiff denies the allegations in Fact 4, and in particular, that Exhibit 5 to Sheila Hickey, M.D.'s Affidavit (Motion Exhibit B), was delivered to Plaintiff on January 4, 2016.  Exhibit 5 does not contain Plaintiff's address, and it is not signed.  Plaintiff did not receive notice of the CSPE decision until January 24, 2013 (*see*, First Amended Complaint, ¶¶16, 17, and 18; **Exhibit 1** Plaintiff's Affidavit No. 1, ¶23). Furthermore, Plaintiff denies "Fact" 5. The policy is not attached to Dr. Hickey's affidavit. Furthermore, Eve Espey, M.D., the faculty member who referred Plaintiff to CSPE, warned him not to raise "free speech" arguments in his CSPE hearing.  Most importantly, four faculty members advised Plaintiff not to petition to have the notation of professionalism violation removed from his student file until he was about to begin Phase III of his medical education.  For Plaintiff, that means September, 2017 (*see*, **Exhibit 1** ¶32). Finally, the so-called "review process" was not mandatory. (See **Exhibit 1C at pp. 2**).

## II.     PLAINTIFF'S UNDISPUTED MATERIAL FACTS

1.      In November, 2012 Plaintiff was a 24 year old medical student enrolled in the University of New Mexico School of Medicine (SOM).  (**Exhibit 1¶ 3**).

2.      Following the November, 2012 general election, Plaintiff commented about the election on his personal Facebook account. (Motion Exhibit A [Doc 3]).

3.      The Facebook post was not directed to any particular person.  (*Id.*).

4.      The Facebook post contained no references to the University of New Mexico, no references to the School of Medicine, and did not identify Plaintiff as a student at the University or at the School of Medicine. (*Id.*).

6.      The Facebook post contained no threats towards any person or organization. (*Id.*).

7.      Eve Espey, M.D., a School of Medicine faculty member, threatened to suspend Plaintiff from the School of Medicine because of the Facebook post. (**Exhibit 1¶9 and ¶11**).

8.     Dr. Espey threatened Plaintiff that the Committee on Student Performance Enhancement (CSPE) might do the following to Plaintiff:  expel him from SOM, suspend him from SOM, order neuropsychological testing, or impose other sanctions. (*Id.* ¶**13**).

9.     Dr. Espey cautioned Plaintiff not to argue "free speech" during his appearance before CSPE, and told Plaintiff she had "immense sway" before CSPE. (*Id.* ¶**14**).

10.     Plaintiff sought the advice of Gregory Franchini, M.D., a faculty member at SOM.  Dr. Franchini told Plaintiff he could not have anyone represent or accompany him at the hearing. (*Id.* ¶**15**).

11.     Although the charge against Plaintiff was limited to the Facebook post (see Motion Exhibit 4B, Scott Carroll, M.D. [chair of CSPE] letter to Plaintiff), the first CSPE hearing committee member to ask a question asked Plaintiff how he felt about Jews. (**Exhibit 1 ¶19**).

12.     The second question asked Plaintiff how he felt about African Americans. (*Id.* ¶**21**).

13.     On January 24, 2013 Plaintiff learned that CSPE determined his Facebook post was "unprofessional" and violated the Respectful Campus Policy and the Social Media Policy.  (*Id.* ¶**23**).

14.     CSPE imposed a "professionalism enhancement prescription" with two components – ethics and professionalism. (*Id.*).

15.     CSPE required Plaintiff to write two "reflective paper(s)," write an "apology" letter, re-write the Facebook post six to eight months hence, and meet monthly for one year with Timothy Nelson, M.D (Plaintiff's "professionalism mentor"). (*Id.*).

16.     CSPE also required the SOM to place a "notation of professionalism violation" in Plaintiff's Dean's Recommendation Letter.  The Letter is a mandatory part of all residency training program applications. (*Id.* ¶**24**).

17.     CSPE also warned Plaintiff that if he wrote a similar Facebook post in the future, he was in danger of being expelled from SOM. (*Id.*).

18.     Dr. Nelson, Plaintiff's professionalism mentor, told Plaintiff that any attempt to appeal the CSPE decision would be "fruitless." (*Id.* **¶26**).

19.     Plaintiff successfully completed everything which CSPE required of him. (*Id.* **¶31**).

20.     Dr. Carroll, the chair of CSPE, told Plaintiff not to petition to have the notation of professionalism violation removed until he was about to begin Phase III of his medical training. For Plaintiff, Phase III will not begin until September, 2017, so he plans to petition in August, 2017. (*Id.* **¶32**).

21.     Plaintiff is aware of Facebook posts and comments from other SOM students which on their face appear to violate the policies which he was found to have violated; however, none of these students were prosecuted by CSPE. (**Exhibit 2 Paul Hunt affidavit No. 2, ¶¶4, 5, and 6**).

## III.     Legal Analysis

### A.  Summary Judgment Standard

Defendants' Motion is brought as a Motion to Dismiss under 12(b)(6). However, the Tenth Circuit has reasoned that where a district court considered facts outside of the complaint, it turns into a request for dismissal under Rule 56(c) and not Rule 12(b)(6).  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005) (unpublished). There are three exceptions to this rule but Defendants' Motion contains documents that render those exceptions inapplicable. Accordingly, the Motion must be determined as a Motion for summary judgment. Defendant has elected to forego setting forth the summary judgment standard since this Court is quite familiar with its tenets except to state that when ruling on a motion for summary judgment, a court must construe the facts in the light most favorable to the nonmovant. See Magnum Foods, Inc. v. Continental Casualty Co., 36 F.3d 1491, 1497 (10th Cir. 1994). All doubts must be resolved in favor of the existence of triable issues. See World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985). Defendants' citation of the qualified immunity standard is essentially correct and will not be repeated here to avoid repetition.

### B.     Plaintiff is not precluded from seeking injunctive relief from the Board of Regents

4

Defendants contend that because the Board of Regents of the University of New Mexico is considered an arm of the state, Plaintiff is precluded from seeking relief against this Defendant because the Board is not a "person" under §1983. (Motion §II at 3). Plaintiff acknowledges that the Board of Regents cannot be sued under §1983. Furthermore, Plaintiff is aware that Board of Regent members, sued in their official capacities, have Eleventh Amendment immunity from money damages. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); accord Johnson v. Wefald, 779 F. Supp. 154, 156 (D. Kan. 1991) (the Eleventh Amendment jurisdictional bar applies to suits seeking monetary damages against state officials). However, Plaintiff can and does seek injunctive relief from individual Board of Regent members in their official capacities, in the form of removing any references to the Facebook post which Defendants have placed in Plaintiff's file in a Dean's letter, as set forth in the Amended Complaint Introduction at 3 (2) & ¶57 seeking Declaratory relief. "In *Ex parte Young,* 209 U.S. 123 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity for suits against state officials seeking to enjoin alleged ongoing violations of federal law." Crowe & Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1154 (10th Cir.2011). "By proceeding on the fiction that an action against a state official seeking only prospective injunctive relief is not an action against the state itself, the *Ex parte Young* doctrine enables federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Id.* (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105 (1984)). An individual can bring an Ex parte Young claim against a state official in federal court for an ADA or § 1983 violation. Roe No. 2 v. Ogden, 253 F.3d 1225, 1233 (10th Cir.2001); see also McLaughlin v. Bd. of Trustees of State Colleges of Colorado, 215 F.3d 1168, 1172 (10th Cir. 2000) (if the plaintiff "…had sued a state official instead of the Board, he could have argued the viability of his claim for prospective injunctive relief because a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective

relief are not treated as actions against the State.") (quoting <u>Will v. Michigan Dep't of State Police</u>, 491

U.S. 58, 71 n. 10 (1989) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n. 14 (1985)).

To determine whether the *Ex Parte Young* doctrine applies, "a court need only conduct a

straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and

seeks relief properly characterized as prospective." <u>Guttman v. Khalsa</u>, 669 F.3d 1101, 1126-27 (10th

Cir. 2012) (quoting <u>Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.</u>, 535 U.S. 635, 645 (2002)

(quotation marks omitted) (alteration in the original); *see also* <u>Green v. Mansour</u>, 474 U.S. 64, 68

(1985) (holding that federal courts have jurisdiction over claims against state officials seeking

prospective injunctive relief "designed to end a continuing violation of federal law"). Here, the

ongoing violation is the placement in Plaintiff's medical school student file of the Dean's letter

regarding Plaintiff's Facebook post and the discipline he was subjected to. Plaintiff seeks prospective

relief in requesting that the Dean's letter be removed from his file.

Finally, pursuant to *Ex Parte Young,* the Supreme Court noted that the state official must have the

power to perform the act required in order to overcome the jurisdictional bar of the Eleventh

Amendment. 209 U.S. at 157. Paul Roth, M.D., a named Defendant, is the Dean of the UNM School of

Medicine, as set forth on UNM's public webpage. [See also Doc 1 ¶6]. As the Dean of SOM, there is

no dispute that he has the authority to remove the Dean's letter from Plaintiff's school records file.

Accordingly, Plaintiff's injunctive relief claims asserted against Paul Roth, M.D. in his official

capacity, is a viable claim in this case, despite Defendants' contentions to the contrary. (Motion at 11).

## C.      First Amendment standards in school setting

The First Amendment prohibits Congress and, through the Fourteenth Amendment, the States,

from abridging freedom of speech. U.S. Const., amend. I; *Gitlow v. New York,* 268 U.S. 652, 666

(1925). It is a bedrock principle of First Amendment jurisprudence that "the government may not

prohibit the expression of an idea simply because society finds the idea itself offensive or

disagreeable." <u>Texas v. Johnson</u>, 491 U.S. 397, 414 (1989).  Furthermore, "[t]he First Amendment is not limited to ideas, statements, or positions which are accepted; which are not outrageous; which are decent and popular; which are constructive or have some redeeming element; or which do not deviate from community standards and norms; or which are within prevailing religious or moral standards.... The First Amendment standards are not adjusted to a particular type of publication or particular subject matter." <u>Mink v. Knox</u>, 613 F.3d 995, 1004 (10th Cir. 2010) *citing* <u>Pring v. Penthouse Int'l, Ltd.</u>, 695 F.2d 438, 443 (10th Cir.1982).

It is also indisputable that Internet speech is protected by the First Amendment. *See, e.g.,* <u>Ashcroft v. ACLU</u>, 542 U.S. 656, 672–73 (2004) (held that Internet content providers and civil liberties groups were likely to prevail on claim that COPA violated First Amendment by burdening adults' access to some protected speech); <u>Reno v. ACLU</u>, 521 U.S. 844, 871–72 (1997) (noting that vagaries contained in the Communications Decency Act were of special concern because the Act is content-based regulation of speech and the vagueness of the provisions raises "…special First Amendment concerns because of its obvious chilling effect on free speech). Furthermore, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. A "major purpose of the First Amendment was to protect the free discussion of governmental affairs" especially of candidates and their beliefs and performance." <u>Republican Party of New Mexico v. King</u>, 741 F.3d 1089, 1092 (10th Cir. 2013) quoting <u>Ariz. Free Enter. Club's Freedom Club PAC v. Bennett</u>, —— U.S. ——, 131 S.Ct. 2806, 2828 (2011); see also <u>Buckley v. Valeo</u>, 424 U.S. 1, 14 (per curiam) (" political speech is the lifeblood of democracy—it is the means by which citizens learn about candidates, hold their leaders accountable, and debate the issues of the day").

With respect to student speech, First Amendment protections extend to and apply to a school setting. Students do not "shed their constitutional rights to freedom of speech or expression at the

schoolhouse gate." <u>Tinker v. Des Moines Indep. Cnty. Sch. Dist.</u>, 393 U.S. 503, 506 (1969). While the Supreme Court has recognized the needs of the States and school officials, consistent with fundamental constitutional safeguards, to prescribe a curriculum and control conduct in schools, *Id.* at 507; *Epperson v. Arkansas,* 393 U.S. 97, 104–05 (1968), students have a clearly-established First Amendment right to free speech both inside and outside a school setting, subject to a limited set of exceptions. Especially "on public university campuses throughout this country,... free speech is of critical importance because it is the lifeblood of academic freedom." As the Supreme Court in *Healy v. James* explained, the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." <u>Healy v. James</u>, 408 U.S. 169, 180 (1972). "It is well recognized that [t]he college classroom with its surrounding environs is peculiarly the marketplace of ideas[,] and [t]he First Amendment guarantees wide freedom in matters of adult public discourse." *Id.* at 180 (citations and internal quotation marks omitted). College students "often have values, views, and ideologies that are at war with the ones which the college has traditionally espoused or indoctrinated," *Id.* at 197. Accordingly, "[p]ublic university 'administrators' are granted *less leeway* in regulating student speech than are public elementary or high school administrators." <u>DeJohn v. Temple Univ.</u>, 537 F.3d 301, 316 (3d Cir. 2008) (emphasis in the original).

> **D.**  ***Tinker* applies to Plaintiff's political off campus speech**

"In First Amendment cases, we are obligated '"to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression."'" <u>Taylor v. Roswell Indep. Sch. Dist.</u>, 713 F.3d 25, 34 (10th Cir. 2013) (citing in part to <u>Barker v. Del City</u>, 215 F.3d 1134, 1137 (10th Cir. 2000). As the Tenth Circuit has noted,

"there are three main categories of speech that occur within the school setting.[1] Fleming v. Jefferson Cty. Sch. Dist. R-1, 298 F.3d 918, 923-24 (10th Cir. 2002), as amended on denial of reh'g and reh'g en banc (Aug. 16, 2002). Student speech that "happens to occur on the school premises" is governed by Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969)." Id. Tinker reasoned that a school may regulate a student's speech or expression if such speech causes or is reasonably likely to cause a "material and substantial" disruption to school activities or to the work of the school. 393 U.S. 503 (1969). In *Tinker,* two high school students and one junior high school student wore black armbands to school in protest of the Vietnam War. School officials asked them to remove the armbands, and they refused. Pursuant to a school policy adopted just days before in anticipation of a protest, the students were suspended until they would return to school without the armbands. *Id.* at 504. The lower court upheld the suspension, but the Supreme Court reversed. *Id.* at 514. In an oft-quoted passage, the Court noted: "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. The Court found that the students' expression constituted political speech. Although the issues raised by such speech were undoubtedly controversial—the propriety of the Vietnam War—the students' conduct was "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on [their] part." *Id.* at 508. The Court held that a student may express his opinions, even on controversial subjects, so long as doing so does not materially and substantially "interfer[e] with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others." *Id.* at 513 (quoting *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir.1966)). Conversely, school discipline is appropriate where the facts "reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" as a result of the student's speech. *Id.* at 514. Applying this test to the facts in *Tinker,* the Court concluded that no actual disruption occurred and there was no

---

[1] Bethel School District No. 403 v. Fraser, 478 U.S. 675 (1986) applies a fourth test involving lewd, offensive, or obscene speech. However, Defendants have not alleged that Plaintiff's speech falls under this category, nor is there precedent supporting such a conclusion.

reason to believe that the students' wearing of the armbands would cause a substantial disruption to the school's activities. Thus, the school's disciplinary action violated the students' First Amendment rights. *Id.* The second form of speech typically addressed in the Tenth Circuit is "government speech, such as the principal speaking at a school assembly. Fleming at *Id.* When the government speaks, it may choose what to say and what not to say. *Id.* Wells v. City & County of Denver, 257 F.3d 1132, 1144 (10th Cir. 2001) ("'[T]he First Amendment does not preclude the government from exercising editorial control over its own medium of expression.'") (quotation omitted). *Id.* Third, lies "school-sponsored" speech, which is governed by *Hazelwood.* School-sponsored speech is student speech that a school "affirmatively ... promote[s]," as opposed to speech that it "tolerate[s]." *Id. citing* Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 270-71 (1988). "[E]xpressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute school-sponsored speech, over which the school may exercise editorial control, "so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 924 *citing* Hazelwood at 271, 273; see also Pompeo v. Bd. of Regents of Univ. of New Mexico, 58 F. Supp. 3d 1187, 1189 (D.N.M. 2014) (J. Armijo) (applying *Hazelwood* to classroom speech at UNM).

Reflective of those principles, the Tenth Circuit has held that in situations "…which do not involve "school-sponsored expressive activities," [citation to *Hazelwood* omitted], the school district's ability to restrict a student's speech requires a showing that such speech would "substantially interfere with the work of the school or impinge upon the rights of other students." Seamons v. Snow, 84 F.3d 1226, 1237 (10th Cir. 1996) (*citing* Tinker at 509). Seamons explained that "[i] n *Tinker,* the Supreme Court set forth the relevant analytical framework for addressing the question of how to accommodate First Amendment rights in the school environment:  A student's personal expression may be restricted where the forbidden conduct "*in class or out of it*, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion

of the rights of others...." *Id.* citing <u>Tinker</u> at 513 (emphasis added). "Thus, if the speech involved is not fairly considered part of the school curriculum or school-sponsored activities, then it may only be regulated if it would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Id. citing* <u>Roberts v. Madigan</u>, 921 F.2d 1047, 1057 (10th Cir.1990) (quoting *Tinker* at 509). The key to applying *Tinker* in the Tenth Circuit is the fact that the speech involved is not school sponsored. For example, in <u>Seamons v. Snow</u>, 84 F.3d 1226 (10th Cir. 1996), a high school student asserted that his First Amendment rights were violated when he complained to school administrators, parents, etc., that he had been sexually assaulted by members of his football team. *Id.* at 1230. The football coach addressed his allegations in front of the football team and demanded that he apologize. *Id.* When he refused, he was dismissed from the team. Subsequently, the incident was publicized through the press and the coach cancelled the last football game of the season- the play-offs- as a result of the controversy. *Id.* The plaintiff was blamed for the cancellation and ultimately the principal suggested to his parents that he transfer to another school to avoid further incident, which he did. The Court, applying *Tinker*, held that the plaintiff had a First Amendment right to report the incident to school administrators, the coach, family, and others and that his conduct:

> ...[N]either disrupted classwork nor invaded the rights of other students. His speech was not part of a school-sponsored expressive activity such that listeners might believe that [the plaintiff's ] speech had the imprimatur of school sponsorship. We simply see no overriding school interest in denying [the plaintiff] the ability to report physical assaults in the locker room. At most, the school's interest here was based on its fear of a disturbance stemming from the disapproval associated with [the plaintiff's] unpopular viewpoint regarding hazing in the school's locker rooms. Under *Tinker,* that is not a sufficient justification to punish [the plaintiff's] speech in these circumstances. *Id.* at 1238.

The Tenth Circuit in <u>Taylor v. Roswell Indep. Sch. Dist.</u>, 713 F.3d 25, 35-36 (10th Cir. 2013) similarly determined that "if the speech involved is not fairly considered part of the school curriculum or school-sponsored activities, then it may only be regulated if it would materially and substantially interfere with the requirements of appropriate discipline." (citing <u>Roberts v. Madigan</u>, 921 F.2d 1047, 1057 (10th Cir.1990) (quotations omitted)). <u>Taylor</u> involved students' distribution of rubber dolls to students

on high school grounds and reasoning that "[p]rivate student expression that is *unconnected to any school-sponsored activity* is subject to the more stringent *Tinker* standard" (quoting Morse v. Frederick, 551 U.S. 393, 405–06 (2007) (emphasis added). *Tinker* has also routinely been applied to off campus speech in a number of other circuits. [2] In each of these cases, the courts applied the *Tinker* substantial disruption test to determine if a First Amendment violation occurred, despite the fact that the speech activity occurred off campus. Accordingly, the standard for evaluating Plaintiff's off campus Facebook post is the *Tinker* substantial disruption test.

## E.     Defendants' are applying a test that has no bearing or application to these facts

Defendants contend that they did not violate Plaintiff's First Amendment rights when they determined that the Facebook post required imposition of a disciplinary measure entitled "professional proscription" comprised of an ethics component, a four (4) part professionalism component, and notation of the "professionalism violation" in the Dean's Recommendation Letter provided to residency programs. (Motion at 4§III; **Exhibit 1 ¶23-25**). Defendants assert that SOM has a pedagogical interest in fostering a professional environment at SOM that overrides Plaintiff's First Amendment rights, that Plaintiff violated UNM's Respectful Campus Policy, and that the sanctions imposed were "mild." (See Motion at §III pps. 4- 5 ¶¶2-3).

Defendants cite to a number of cases from other circuits and the Minnesota courts, arguing that a student enrolled in a professional program may be subject to sanctions without violating the First

---

[2] Shanley v. Northeast Independent Sch. Dist., 462 F.2d 960, 970–71 (5th Cir.1972) (applied *Tinker* to a case involving a student-created underground newspaper that was drafted and distributed off campus, where some copies turned up on the campus); see also Morgan v. Swanson, 659 F.3d 359, 370, 388-89 (5th Cir. 2011) (applying *Tinker* to case involving a student who distributed "Jesus" pencils to students who approached her and asked for one after school, while on school property, reasoning that the conduct was private rather than school-related); *see also* Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 39 (2d Cir. 2007) (interpreting Sullivan v. Houston Indep. Sch. Dist., 475 F.2d 1071, 1075 (5th Cir. 1973) (as applying *Tinker* to off-campus speech involving an instant message which had an icon depicting shooting of a teacher); *Porter v. Ascension Parish Sch. Bd.,* 393 F.3d 608, 615 n. 22, 619 n. 40 (5th Cir.2004) (same); S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 777-78 (8th Cir. 2012) (Court applied *Tinker* to a case involving two high school students who created a website and blog to discuss events at the high school and posted racist comments and sexually explicit and degrading comments about particular female classmates, who they named, as well as mocking black students who attended the high school); Boucher v. Sch. Bd. of Sch. Dist. of Greenfield, 134 F.3d 821, 827–28 (7th Cir.1998) (applied *Tinker* in a case involving a student who was disciplined for authoring an article printed in an underground newspaper).

Amendment if the speech violates the academic programs rules "that are narrowly tailored and directly related to established professional standards." (Motion at 6¶2) (quoting Tatro v. University of Minnesota, 816 NW 2d 509, 511 (Minn. 2012). This standard is an offshoot of the pedagogical approach set forth in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988) (providing that "student speech in a school-sponsored medium could be restricted by school officials if the actions were 'reasonably related to legitimate pedagogical concerns.'" (Motion at 5). However, the Hazelwood standard applies when "students, parents, and members of the public might reasonably perceive [the speech] to bear the imprimatur of the school." Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25, 36 (10th Cir. 2013) (quotation omitted). The Tenth Circuit has determined that the Hazelwood standard should not be applied to private, rather than school-sponsored speech, electing instead to apply the substantial disruption test set forth in Tinker v. Des Moines, 393 U.S. 503 (1969). See Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25, 35-36 (10th Cir. 2013) (case involved distribution of rubber dolls made off school premises and distributed to students on high school grounds reasoning that "[p]rivate student expression that is *unconnected to any school-sponsored activity* is subject to the more stringent *Tinker* standard") (quoting Morse v. Frederick, 551 U.S. 393, 405–06 (2007)).

Defendants are essentially asking this Court to apply a standard that has not been utilized in this Circuit and that does not apply to the particulars of this case. In fact, the cases Defendants rely on are distinguishable on their facts, are not persuasive, and are not binding on this Court.[3] For example, Tatro v. University of Minnesota, 816 N.W. 2d 509 (Minn. 2012), is a Minnesota Supreme Court case involving a mortuary student attending the University of Minnesota's mortuary science program. *Id.* at 512. The student enrolled in several labs and was required, prior to taking the labs, to sign an "Anatomy Bequest Program Human Anatomy Access Orientation Disclosure Form", whereby she

---

[3] District court decisions or sister circuit decisions are not binding on this Court and the Court has discretion to determine whether they have persuasive value which may be considered by the court in evaluating any argument or claim. See U.S. v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005) ("an unpublished opinion or order and judgment which has persuasive value with respect to a material issue in the case and would assist the court in its disposition, we allow citation to that decision").

agreed to comply with the rules as well as laboratory policies set forth in course syllabus. *Id.* "The course syllabus for the anatomy lab included rules 'set up to promote respect for the cadaver.'" *Id.* "The anatomy lab rules allowed 'respectful and discreet'" "[c]onversational language of cadaver dissection outside the laboratory," but prohibited "blogging" about the anatomy lab or cadaver dissection. *Id.* The instructor for the anatomy lab course testified that "blogging" was intended to be a broad term and that she explained to the students during orientation that blogging included Facebook and Twitter. Students were advised that "[f]ailure to adhere to these rules may result" in the student's "eviction" from the anatomy lab and the course. *Id.* The plaintiff subsequently posted a number of entries on Facebook whereby she joked about working on a particular cadaver and commented that she wanted to stab someone. *Id.* After learning about the posts, the University held a hearing and imposed various disciplinary measures for violating the lab rules and disclosure form, as well as writing what they deemed to be a threat (the stabbing remark). *Id.* The Court determined that "[e]ven though courts have applied *Tinker* to speech originating off campus that reaches the attention of school authorities, at least in the K–12 setting, we decline to apply the *Tinker* substantial disruption standard to Tatro's Facebook posts…The driving force behind the University's discipline was not that Tatro's violation of academic program rules created a substantial disruption on campus or within the Mortuary Science Program, but that her Facebook posts violated established program rules that require respect, discretion, and confidentiality in connection with work on human cadavers. *Id.* at 519-20. The Court ultimately held that:

> Tatro acknowledges that the University may constitutionally regulate "off-campus conduct that violate[s] specific professional obligations." Specifically, Tatro understood that there were limitations on what she could post on Facebook about her work with human cadavers… [T]he parties agree that a university may regulate student speech on Facebook that violates established professional conduct standards. This is the legal standard we adopt here, with the qualification that any restrictions on a student's Facebook posts must be narrowly tailored and directly related to established professional conduct standards. Tying the legal rule to established professional conduct standards limits a university's restrictions on Facebook use to students in professional programs and other disciplines where student conduct is governed by established professional conduct standards. And by requiring that the restrictions be narrowly

tailored and directly related to established professional conduct standards, we limit the potential for a university to create overbroad restrictions that would impermissibly reach into a university student's personal life outside of and unrelated to the program. Accordingly, we hold that a university does not violate the free speech rights of a student enrolled in a professional program when the university imposes sanctions for Facebook posts that violate academic program rules that are *narrowly tailored* and *directly related* to established professional conduct standards. *Id.* at 520-21 (emphasis added).

It is evident from the Court's reasoning that the holding was based on the fact that the plaintiff signed a specific disclosure form that she violated, and engaged in behavior that was directly related to the professional program she was enrolled in. In contrast, Plaintiff's Facebook post does not threaten anyone, does not involve SOM or fellow students, and does not implicate his role as a medical student or the practice of medicine. Moreover, the discipline imposed was based on a general and vague prohibition barring any UNM student from "making unduly inflammatory statements." In *Tatro*, the Court determined that the University had specific rules prohibiting blogging about work on cadavers and requiring discretion and respect for the cadavers students were working on, and the sanctions imposed were narrowly tailored because they reflected the rules of the program, rather than private conversations. *Id.* at 523. Here, the sanctions were not narrowly restricted, but rather were "substantially broader than necessary" because they penalized speech that had no relationship whatsoever to the medical program, professors, or students at SOM. See <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 799 (1989) (holding that the government's "regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"). Under such circumstances, the sanctions violated Plaintiff's First Amendment right to free speech because they not only penalized private conduct, but banned conduct based on policies that were, at best, ambiguous and unrelated to the professional standards governing the study or practice of medicine.

Defendants also rely heavily on <u>Oyama v. University of Hawaii</u>, 813 F.3d 850 (9th Cir. 2015), a case that was decided <u>three years</u> after the speech at issue in this case. <u>Oyama</u>, involved a student who was denied admission to a student teaching program based on the student's comments in class assignments that he did not believe that consensual sex between a minor and a teacher should be against the law, pedophilia should be legalized, and his significant reluctance in accommodating students with disabilities. The defendants rejected his application because : 1) his comments regarding sexual contact between a teacher and student, were in opposition to state and national standards governing teachers and in violation of the State Department of Education Rules prohibiting sexual contact between teachers and students or minors as well as the teachers' duty to protect students set forth in those rules; 2) his comments regarding his seeming unwillingness to accommodate students with disabilities in violation of state and national standards; and 3) he had received unacceptable ratings in his field experience evaluation from several professors. *Id.* at 857-58. The School determined that that he did not meet the basic standards set forth by the State and, as such, he would not be accepted into the program. *Id.* The statements the plaintiff in <u>Oyama</u> made <u>in writing assignments for classes he was enrolled in</u>, which served as the basis for his denial to the program, were all made in the context of his role as a prospective teacher applying for the teacher program, thereby implicating his fitness to become a teacher. The Court's analysis ultimately "…focus[ed] on the relationship between the University's decision and the standards of the profession in which Oyama sought certification, [and] []join[ed] the other courts that have considered free speech claims *in the certification context"…Id.* at 869. In fact, <u>Oyama</u> expressly states: "A third framework for analysis more aptly suits Oyama's claim: a set of decisions of other courts that have considered free speech claims in the "certification context". *Id.* at 866-67 (citing *generally* Emily Gold Waldman, *University Imprimaturs on Student Speech: The Certification Cases,* 11 First Amend. L. Rev. 382 (2013)). Furthermore, <u>Oyama</u> notes that the cases dealing with certification give "…some deference to the certifying

institution, but with significant limitations. *Id.*, and cannot be based "…on officials' personal disagreement with students' views". *Id.* at 867-68. In evaluating the first prong of the test, <u>Oyama</u> opined that:

> The University's decision was directly related to defined and established professional standards. Two sets of professional standards provided the foundation for the University's decision: one governing sexual relationships with children and another governing the education of disabled students. Oyama stated that "it would be fine" for "a 12–year–old girl" to have a "consensual" relationship with her teacher, that "the age of consent should be either 0, or whatever age a child is when puberty begins," and that "real life child predation should be legal." As the University explained to Oyama, however, Hawaii Department of Education Rules prohibit sexual contact between teachers and students or minors. *See* Haw. Admin. Rules, § 8–54–9. Furthermore, the HTSB requires all teachers to "take all reasonable precautions" to protect student safety. *See* HTSB Code of Ethics, Principle I. To protect a student's "safety," a secondary school teacher must protect underage students from sexual contact with adults, which may qualify as first-degree sexual assault under Hawaii law. *See* Haw.Rev.Stat. § 707–730. *Id.* at 868…

> We emphasize that the University did not "establish" or "define" these professional standards by fiat. Its decision was not, in other words, based on school policies untethered to any external standards, regulations, or statutes governing the profession. Instead, the University relied upon standards established by state and federal law, the Hawaii Department of Education, the HTSB, and the University's national accreditation agency, the NCATE. *Id.* at 868-70.

Finally, with respect to the reasonable professional judgment prong, <u>Oyama</u> determined that: 1) "…the University had every reason to conclude that Oyama's statements concerning sexual relationships between teachers and students were "serious matters of concern"; 2) "The University could reasonably conclude that a candidate who expresses his view that special education students are "fakers" to his professors would lack the professional disposition necessary to identify disabled students and teach all students, including those with disabilities"; and 3) "The University could also reasonably conclude that a candidate who considers it unreasonable to teach both disabled and non-disabled students would not put in the effort to "provide services to students in a nondiscriminatory manner" as a teacher. Pursuant to Haw. Rev. Stat. § 302A-803 HTSB requires that applicants for licensure "be recommended for licensure by a Hawaii Educational Preparation Program using a performance assessment as the clinical experience requirement." (Standard License). In contrast, to

obtain a license to practice medicine in the State of New Mexico, the New Mexico Medical Board "…may consider for licensure a person who is of good moral character, is a graduate of an accredited United States or Canadian medical school, has passed an examination approved by the board and has completed two years of an approved postgraduate training program." NMSA (1978) § 61-6-11. Thus, unlike the defendants in <u>Oyama</u>, SOM has no duty to determine the fitness of its medical students to obtain a license to practice medicine in this state. Furthermore, it is quite evident that the Facebook post underlying this case has none of the earmarks or warning bells that could result in the concerns raised in <u>Oyama</u>. The Facebook post is nothing more than political venting that has no bearing on Plaintiff's certification as a doctor. The sanctions issued were not based on state or national standards governing the profession, but rather on vague University policies that have nothing to do with Plaintiff's fitness to practice medicine or his ability to obtain a medical license. Furthermore, the sanctions imposed were hardly narrowly tailored, particularly since the sanctions were based on political speech made outside the school that was wholly unrelated to the medical school or the practice of medicine. In short, while the test applied in <u>Oyama</u> is a minority opinion that has only been cited by two other state cases, and has no precedential value in this case, even under its analysis, Defendants' claim that Plaintiff's First Amendment rights were not violated fails under <u>Oyama's</u> analysis.

Defendants' reliance on <u>Keeton v. Anderson-Wiley</u> is equally untenable because as <u>Oyama</u> points out in referencing this case *"[b]y focusing on the relationship between the University's decision and the standards of the profession in which Oyama sought certification, we join the other courts that have considered free speech claims <u>in the "certification context"</u>. <u>Oyama</u> at Id. (citing* <u>Keeton</u>, 664 F.3d at 869) (upholding a university's decision to sanction a graduate student in a school counseling program where the student's statements to professors in class and students in and out of class suggested that she would "violate several provisions of the American Counseling Association's (ACA) Code of Ethics

which [the university] was required to adopt and teach" to offer an accredited counseling program, by advising that when she became a counselor she would send patients to conversion therapy and/or attempt to convince patients that being homosexual was wrong.  With respect to Defendants' reliance on Keefe v. Adams, 44 F. Supp. 3d 874, 888-89 (D. Minn. 2014), another case published two years after the Facebook post in this case, the analysis used by that state supreme court has no bearing on this case. In Keefe, a nursing student was dismissed from a nursing associate's degree program based on Facebook postings he authored in which he belittled another student who needed testing accommodations, admitted he needed anger management classes, questioned whether anyone had heard of a mechanical pencil, stated that he would give somebody a hemopneumorthorax with an electric pencil sharpener, and called a fellow student a "bitch." The Court held that the College could hold the student to the standards of the nursing profession and his removal from the program did not violate his rights under the First Amendment because he violated nursing standards-i.e. his conduct directly implicated his fitness to become a nurse based on his harassment of other students, and discussion of performing medical procedures in an improper and offensive way.  Similarly, Defendants' reliance on Yoder v. Univ. of Louisville, 526 F. App'x 537, 541-42 (6th Cir. 2013) (an unpublished opinion issued a year after the Facebook post here) also involved a student's conduct in the context of her fitness to practice nursing. In Yoder, a nursing student was dismissed from a nursing program for posting a blog about a patient giving birth which contained negative comments about pregnancy as well as identifying herself as belonging to the nursing program where she observed the birth. The University dismissed her from the program for violating the nursing pledge and nursing standards set forth therein. *Id.* Although she applied for re-admittance, her application was denied. *Id.* The Court held in part that the university could dismiss the student for violating a patient's privacy, especially since the "[d]efendants have legal and ethical obligations to ensure that patient confidentiality is protected, and that: 1) nursing students are trained with regard to their ethical

obligations" (citing to state statute); 2) the Plaintiff accessed the patient through the nursing program, that she had signed an agreement not to breach the confidentiality of patients observed; and 3) she had waived her right to post the blog as a First Amendment right when she signed the school's Confidentiality Agreement, which stated that revealing confidential information could result in immediate dismissal from the school. *Id.* at 545-46 (6th Cir. 2013). In short, the plaintiff's conduct in that case, as in the other cases Defendants cite to, involved conduct that either occurred on campus, or directly related to the programs they were studying and/or the regulations or agreements the students entered into in association with their studies.

In contrast, Plaintiff's Facebook post by definition, political speech. Furthermore, as stated above, the Facebook post made no reference to SOM, any student, any medical procedure or medical practice that could potentially reflect on his fitness to practice medicine, and it was not violative of any of the profession's rules, state laws, or regulations. To apply the analysis used by these cases would be improper because in doing do, the Court would be stating that a medical student cannot use foul language or express political views simply because professors at the medical school or some of its students do not agree with his speech. The fact that Plaintiff is a medical student does not somehow raise the bar on what is or is not acceptable speech when the school, its students, and/or the profession are not implicated by the speech, as in the cases Defendants rely upon. Finally, Defendants' contention that sanctions imposed were "mild" is incredible, given the number of sanctions imposed and the continuing effects on Plaintiff because his potential expulsion remains a constant threat. Moreover, the chilling effect of the sanctions is ever present.[4]

---

[4] "Where, as here, much of the punishment has been completed before judicial review can be obtained, many students will be content to suffer in silence, a silence that may stifle future expression as well. Thomas v. Bd. of Ed., Granville Cent. Sch. Dist., 607 F.2d 1043, 1052 (2d Cir. 1979). "…[S]tudents are not only less likely to challenge a punishment, but the state in the person of school officials can more easily "prosecute" than if they proceeded through the judicial process. *Id.* The chilling effect, therefore, is intensified because the promise of judicial review is virtually an empty one." *Id.*

**F.     Defendants are not entitled to qualified immunity because Plaintiff's speech did not substantially disrupt SOM**

The substantial disruption inquiry is highly fact-intensive. Several factors are critical to this analysis. First, the fact that students are discussing the speech is not sufficient to create a substantial disruption, at least where there is no evidence that classroom activities were substantially disrupted. *See* Tinker*,* 393 U.S. at 514 (armbands which caused students to make comments, to poke fun at the students wearing the armbands, and caused one student to feel "self-conscious" about attending school with his armband., and a dispute between two students in a classroom regarding wearing of an armband "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others" noting that "[t]hey caused discussion outside of the classrooms, but no interference with work and no disorder"); Bethlehem Area Sch. Dist*.,* 807 A.2d 847, 868 (P.A. 2002) (noting that "there must be more than some mild distraction or curiosity created by the speech…[but] complete chaos is not required for a school district to punish student speech" (citation omitted); J.C. v. Beverly Hills Unified School District*,* 711 F.Supp.2d 1094, 1117-19 (C.D.Cal.2010) (where school administrators dealt with the aftermath of a student's video clip posted to the website "YouTube," in which a group of students engaged in trash-talking about a fellow student, court held that getting a phone call from disgruntled parent, and evidence that a student temporarily refused to go to class and that five students missed some undetermined portion of their classes because of the episode, did not rise to the level of a substantial disruption); T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp., 807 F. Supp. 2d 767, 783 (N.D. Ind. 2011) ("two complaints from parents and some petty sniping among a group of 15 and 16 year olds …can't be what the Supreme Court had in mind when it enunciated the "substantial disruption" standard in *Tinker.* To find otherwise would be to read the word "substantial" out of "substantial disruption"); Scoville v. Bd. of Educ. of Joliet Township*,* 425 F.2d 10, 14 (7th Cir.1970) (protected speech that "undoubtedly offended and displeased the dean" but is not shown to have substantially disrupted or materially interfered with school activities cannot be punished).

As evidenced by these cases, the mere fact that discussion is generated, without more, is insufficient to constitute a substantial disruption under the *Tinker* standard. However, where a student's speech is violent or threatening to members of the school, several courts have found that a school can reasonably portend substantial disruption. See e.g. <u>LaVine v. Blaine School District</u>, 257 F.3d 981, 990 (2001) (poem written at home by student and shown to teacher which described a mass shooting of classmates and his own suicide, along with history of violent tendencies that the school was aware of, created met the substantial disruption test.

Another second factor relevant to the substantial disruption inquiry is whether school administrators are pulled away from their ordinary tasks to respond to or mitigate the effects of a student's speech. See e.g. *Doninger v. Niehoff* 527 F.3d 41, 51 (2d Cir.2008) (email message and blog posting about a purportedly cancelled school event created a substantial disruption because school officials were required to deal with a "deluge of calls and emails" from students and angry parents related to the event and students who created the email were removed from class to handle and "manage the growing dispute"); <u>Boucher v. School Board of the School District of Greenfield</u>, 134 F.3d 821, 827 (7th Cir.1998) (because school officials had to devote time and energy to the harm created by the student's underground article on how to hack into the school's computers and publication of the school's restricted access codes supported a finding of substantial disruption); <u>Layshock v. Hermitage School Dist.</u>, 496 F.Supp.2d 587, 601 (W.D.Pa.2007) (implying that where the school's response itself, as opposed to the underlying student speech, is the cause of substantial disruption, discipline may not be appropriate).

Third, the Court must consider whether the school's decision to discipline is based on *evidence* or *facts* indicating a foreseeable risk of disruption, rather than undifferentiated fears or mere disapproval of the speech. For example, in <u>Beussink v. Woodland R–IV School District</u>, the court granted a preliminary injunction in favor of the student on a First Amendment claim, finding that the principal's

disciplinary measure was based on his emotional reaction to the speech, rather than any risk of disruption. 30 F.Supp.2d 1175 (E.D.Mo.1998). In *Beussink,* the plaintiff had created a website criticizing the school administration. *Id.* at 1177. Another student discovered the website and accessed it at school to show it to a teacher. *Id.* at 1177–78. The teacher went directly to the principal to inform him of the site, who viewed the website and was upset. *Id.* at 1178. The principal testified that he made the decision to discipline plaintiff "*immediately* upon viewing the homepage ... because he was upset that the homepage's message had been displayed in one of his classrooms." *Id.* (emphasis in original). The website was accessed twice more by students that day and some teachers discussed it with students; however, there was no disruption to class work. *Id.* at 1178–79. The court concluded that the school disciplined plaintiff because the principal was upset, and not "based on a fear of disruption or interference ... (reasonable or otherwise)." *Id.* at 1180. Thus, the discipline failed to meet the requirements of *Tinker. Id.*

In this case, Plaintiff's Facebook post was brought to the attention of SOM professors by several students. (**Exhibit 1¶12**). Defendants immediately questioned Plaintiff about the post and advised him that a disciplinary hearing would be held five days later, that he would have to provide a written statement at the hearing, and that discipline might ensue. (*Id.*). As evidenced by the first letter issued by SOM, Plaintiff was not accused of creating a substantial disruption to SOM activities but rather was accused of violating a vague UNM policy, and SOM social media policy, which essentially relates back to the UNM policy. Nowhere in either the initial letter, or the second letter issuing the disciplinary sanctions is there any indication that Plaintiff was being penalized for anything other than posting an opinion that Defendants apparently felt was offensive. Furthermore, the Facebook post contains no reference to any student, SOM, or the medical community. The post contains no threats of any kind. Under such circumstances, Defendants disciplinary measures were extreme and violative of the First Amendment. Defendants' opinion that the post was unprofessional is not sufficient under

*Tinker* to penalize Plaintiff for off campus speech that happened to make its way onto campus by other students. Defendants are not entitled to qualified immunity because they are of the opinion that Plaintiff's speech was unprofessional. "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." Rivera v. E. Otero Sch. Dist. R-1, 721 F. Supp. 1189, 1192-93 (D. Colo. 1989). School officials cannot suppress "expressions of feelings with which they do not wish to contend." Burnside v. Byars, 363 F.2d 744, 749 (5th Cir.1966).

**G.      Plaintiff's First Amendment Right to express political views was clearly established at the time the Facebook post occurred**

Defendants contend that because there is no Supreme Court or Tenth Circuit case ruling on "whether and under what conditions a professional program at a public university such as the School of Medicine may take action against a student for postings on social media outside the school" (Motion at 9¶1), Plaintiff cannot survive a qualified immunity challenge under this prong of the two part test. Defendants contend that other jurisdictions have specifically held that the First Amendment rights of students enrolled in professional state-sponsored programs were not clearly established at the time that the underlying sanction was imposed. (*Id.*). In support, Defendants rely on the Keefe case, which specifically involved conduct by a nursing student that called the student's fitness to practice nursing into question. To begin with, Defendants are asking this Court to adopt an extremely narrow standard that has never been employed in this Circuit, and does not apply to these facts. Plaintiff's Facebook speech did not threaten anyone, implicate any student, the school, or the practice of medicine, and has no bearing on his licensure to practice medicine. Furthermore, as described in significant detail *supra* §D, the Tenth Circuit as well as sister circuits, uniformly apply *Tinker* to off campus activity. In fact, Defendants acknowledge as much by citing to five other circuits that have applied *Tinker* to off campus activity, including internet speech. In fact, the Tenth Circuit has expressly held in Seamons v. Snow, 84 F.3d 1226, 1238 (10th Cir. 1996) (where student complained to school administrators,

students, parents, and the press that he was sexually assaulted by other football players, that "[i]n light of the well established principle that the government may not deny a benefit to a person because of his constitutionally protected interests, *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697–98, and the well established framework of the *Tinker* analysis, we cannot say at this point that [d]efendants are entitled to qualified immunity." Resolving all reasonable inferences in [plaintiff's favor], the complaint states a claim that [d]efendants violated clearly established law when [plaintiff] was dismissed from the football team because of his speech").

   "In showing that the law was clearly, established, the plaintiff does <u>not</u> have to show that the specific action at issue has been held unlawful, but the alleged lawfulness of the defendant's conduct must be apparent in light of preexisting law." <u>Armijo v.</u> <u>Wagon Mound Pub. Sch</u>., 159 F.3d 1253, 1260 (10th Cir. 1998). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson</u>, 483 U.S. at 640; <u>Horstkoetter v.</u> <u>Department of Public Safety</u>, 159 F.3d 1265, 1278 (10th Cir. 1998) (In short, some, but not identical, correspondence is required between the cases cited and the factual situation in the case at hand.). To show a right is clearly established, there must be Supreme Court or Tenth Circuit law on point, <u>or</u> the weight of authority from other courts must support the plaintiff's proposition. See <u>Armijo</u> at 1260. "However, we <u>do not</u> require plaintiffs to produce a factually identical case, but allow some degree of generality in factual correspondence." *See Id.* at 1156–57 (emphasis added). If the plaintiff meets his burden of coming forward with facts or allegations which would demonstrate that the defendant's alleged violation should have been apparent in light of preexisting law, then the defendant assumes the normal summary judgment burden of establishing that no material facts remain in dispute that would defeat his claim of qualified immunity. See <u>Woodward v. City of Worland</u>, 977 F.2d 1392, 1396-97 (10th Cir. 1992); <u>Jantz v. Muci</u>, 976 F.2d 623, 627 (10th Cir. 1992).

Plaintiff's internet and political speech were clearly established First Amendment rights at the time that the Facebook post occurred. Furthermore, the *Tinker* standard was well established in 2012, and has been employed by the Tenth Circuit in evaluating off campus speech. Moreover, numerous circuits and district courts have applied *Tinker* to off campus speech and internet speech. The fact that Plaintiff is studying to become a doctor does not somehow heighten the bar such that his very enrollment in the medical school waives his rights to free speech. Under Defendants' analysis, the mere fact of his enrollment in a professional program minimizes his First Amendment privileges. That is not the law in this Circuit, the Supreme Court, or the majority of circuits dealing with off campus speech which apply the *Tinker* standard. Finally, at the university level, First Amendment rights must be construed more broadly. See e.g. <u>Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist.</u>, 682 F.2d 858, 863 (9th Cir. 1982) ("The activities of high school students, for example, may be more stringently reviewed than the conduct of college students, as the former are "in a much more adolescent and immature stage of life and less able to screen fact from propaganda") (citations omitted). Defendants' attempt to narrow the First Amendment landscape to escape liability is simply not plausible under these facts, or the governing precedent establishing otherwise.

**H.**     **Issues of material fact exist regarding whether or not Plaintiff' Due Process rights were violated**

Defendants contend that Plaintiff was afforded all the due process that as the Fourteenth Amendment requires because he was : 1) notified of potential violations; 2) was told he could provide a written statement to present at the hearing, 3) was told that he could face dismissal from SOM; and 4) was provided with an opportunity to have the matter reviewed by the Senior Associate Dean. (Motion at 10§IV).

In order to state a claim, a plaintiff must allege a deprivation of a sufficient property or liberty interest to invoke the protection of the Due Process Clause of the Fifth Amendment. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569–70 (1972). Defendants do not appear to dispute that Plaintiff has a property

right in his education since they are assuming arguendo that he does. Once a sufficient property interest is found, the government cannot deprive an individual of that interest without due process. Gillihan v. Shillinger, 872 F.2d 935, 939 (10th Cir.1989). Due process ordinarily "requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." Miller v. Campbell County, 945 F.2d 348, 353 (10th Cir.1991) (quotation omitted), *cert. denied,* 502 U.S. 1096 (1992). The disciplinary process of universities does typically implicate the Due Process Clause. Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 633 (6th Cir.2005). Disciplinary processes implicate due process because they have the potential to deprive a student of either "the liberty interest in reputation" or "the property interest in education benefits temporarily denied." Goss v. Lopez, 419 U.S. 565, 576 (1975) (10-day suspension implicates due process). There is no question but that a student charged with misconduct has a right to an impartial tribunal. Jenkins v. Louisiana State Bd. of Ed., 506 F.2d 992, 1003 (5th Cir. 1975). "Due process of law is violated when the government vindictively attempts to penalize a person for exercising a protected statutory or constitutional right."Richard v. Perkins, 373 F. Supp. 2d 1211, 1218-19 (D. Kan. 2005) (citing United States v. Conkins, 9 F.3d 1377, 1382 (9th Cir.1993). Where potential dismissal is based on disciplinary reasons, the student should receive both notice and a hearing before the dismissal. *See* Goss, 419 U.S. at 581. The notice and hearing need not necessarily be formal, but should be commensurate with the circumstances and severity of the situation. *See Id.* at 581–84. Plaintiff was told on November 15, 2012 that a hearing based on his Facebook post would be held on November 20, 2012. (**Exhibit 1B**). He faced disciplinary action up to and including expulsion based on his alleged violations of the *inflammatory statements* provision of the UNM Respectful Campus Policy and attendant SOM Social Media policy, which essentially states that a student needs to follow the first policy. (*Id.*).  Dr. Espey stated that she was reporting him, and that he would be reported as a second offender, based on a prior discussion with a professor regarding his views on circumcision. (*Id.*¶**12**). Dr. Espey also told him that

if he argued that he had a First Amendment right to post what he did, things would go poorly for him. (*Id.* **¶14**). He was also told that he was required to provide a written statement which he would read before CSPE. (*Id.* **¶13**). The hearing began with questions pertaining to whether or not he was prejudiced against Jewish people or people of color and whether or not he was a violent person. (*Id.* **¶19, 21**). In short, Plaintiff, who was told he was facing possible expulsion during his first year of medical school, was also told that he had no defense and should fall on his sword to avoid expulsion, and was then confronted with questions at the hearing that had nothing to do with the alleged violations he was required to respond to. Issues of genuine material fact as to whether or not he received appropriate due process under these circumstances precludes dismissal of this claim. See e.g. Esteban v. Cent. Missouri State Coll., 290 F. Supp. 622, 631 (W.D. Mo. 1968), aff'd, 415 F.2d 1077 (8th Cir. 1969) (" A federal court should not intervene to reverse or enjoin disciplinary actions relevant to a lawful mission of an educational institution unless there appears one of the following: (1) A deprival of due process, that is, fundamental concepts of fair play…(3) Denial of federal rights, constitutional or statutory, protected in the academic community; or (4) Clearly unreasonable, arbitrary or capricious action. Furthermore, some of the questions posed to Plaintiff create a genuine issue of material fact regarding whether or not CSPE members had a predisposition against him and were judging him based on conduct that was unrelated to the allegations he was put on notice of. Furey v. Temple Univ., 730 F. Supp. 2d 380, 396 (E.D. Pa. 2010) ("…issues with respect to bias and impartiality are the most important reasons why summary judgment cannot be granted on the [student's] due process claim").

     Furthermore, there are issues of material fact related to whether or not the sanctions imposed were arbitrary and capricious. "[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision; substantive due process, on the other hand, guarantees that the state will not deprive a person of those

rights for an arbitrary reason regardless of how fair the procedures are that are used in making the decision". Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs., 936 F.2d 483, 490 (10th Cir.1991); see also Jenkins v. Louisiana State Bd. of Ed., 506 F.2d 992, 1003 (5th Cir. 1975) (prejudice of university board governing discipline can be viable claim but cannot be based on "speculation or tenuous references").

The sanctions imposed in this case, are not *de mimimis* sanctions, but rather evidence that Plaintiff was being punished for the content of his post. (See Exhibit 1¶¶22-25).The fact that other UNM and SOM students have posted vulgar posts and have not been disciplined, calls into question why Plaintiff was singled out. (See **Exhibit 2 and attachments A-C**). Furthermore, Plaintiff has no way of knowing how the sanctions were determined, what evidentiary standard was used to determine his alleged guilt, or what factors were used in fashioning the sanctions. The fact that Plaintiff was required to perform any number of activities, and was required to rewrite the Facebook post until CSPE was satisfied with its wording, further demonstrates that issues of material fact exist that it was the content of Plaintiff's speech that was the basis for the sanctions imposed. Furthermore, the policies Plaintiff allegedly violated are facially deficient because they do not adequately put Plaintiff or any student on notice of what conduct is prohibited.[5] The term *inflammatory statements* is subject to multiple interpretations and does not provide adequate notice of what conduct is prohibited. Under such circumstances, Plaintiff's due process claim survives scrutiny at this juncture.

## IV.   CONCLUSION

Defendants' Motion should be denied, with the exception of its request to dismiss the Board of Regents. Plaintiff has adequately pled his First Amendment claims and has amply demonstrated that under *Tinker* his rights were violated and that those rights were clearly established at the time that the

---

[5] See e.g. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51 (1969) ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority is unconstitutional.").

triggering event occurred. Plaintiff's due process claim is also viable and raises serious questions about why Plaintiff was sanctioned. Defendants' request that this Court adopt a standard that is foreign to this Circuit and completely contradictory to existing precedent, should be denied.

Respectfully submitted,

THE BAKER LAW GROUP

By: */s/ Renni Zifferblatt* _____

Jeffrey L. Baker
Renni Zifferblatt
20 First Plaza NW, Suite 402
Albuquerque, New Mexico 87102
Telephone: (505) 247-1855
Facsimile: (505) 766-9113
Email: jeff@bzjustice.com
renni@bzjustice.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2016, I filed the foregoing electronically, which caused it to be served to counsel by electronic means. A courtesy copy was also e-mailed to all counsel of record on this date.

*/s/ Renni Zifferblatt*
Renni Zifferblatt