# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**PAUL HUNT,**

**Plaintiff,**

**vs.**                                                    Civ. No.  16-272 JCH/KK

**BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO;
SCOTT CARROLL, M.D., in his individual
and official capacities; JOHN DOE and
JANE DOE MEMBERS OF THE COMMITTEE
FOR STUDENT PROMOTION AND
EVALUATION, in their individual and
official capacities, TERESA A. VIGIL, M.D.,
in her individual and official capacities;
PAUL ROTH, M.D., in his individual and
official capacities,**

**Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendants' Motion to Dismiss or for Summary Judgment* [Doc. 3]. In addition to the motion and supporting brief, the Court has considered the Plaintiff's response [Doc. 15] the Defendants' reply [Doc. 16], the evidence submitted by the parties, and the relevant legal authorities. The Court concludes that Defendants are entitled to qualified immunity on Plaintiff's constitutional claims against them, and that the motion for summary judgment should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are supported by the record and viewed in the light most favorable to the Plaintiff.

In November of 2012, Plaintiff Paul Hunt was a medical student at the University of New Mexico School of Medicine ("UNMSOM"). Doc. 1-1 at 1. UNMSOM has a Social Media Policy to address the use of social media sites such as Facebook, Twitter, YouTube and Flickr, which provides in pertinent part:

- Be mindful that all posted content is subject to review in accordance with UNMSOM policies and the Student Professional Code of Conduct.
  …
- Exercise discretion, thoughtfulness and respect for your colleagues, associates and the university's supporters/community (social media fans). Avoid discussing or speculating on internal policies or operations. Refrain from engaging in dialogue that could disparage colleagues, competitors, or critics.
- Refrain from reporting, speculating, discussing or giving any opinions on university topics or personalities that could be considered sensitive, confidential or disparaging.
  …
- UNMSOM does not routinely monitor personal websites or social media outlets, however any issues that violate any established UNM Policy will be addressed.
- Violation of this or an UNM policy may result in disciplinary action, up to and including dismissal from UNM.

Doc. 3-2.

The University of New Mexico has also adopted a Respectful Campus Policy. It provides, in relevant part:

Individuals at all levels are allowed to discuss issues of concern in an open and honest manner, without fear of reprisal or retaliation from individuals above or below them in the university's hierarchy. At the same time, the right to address issues of concern does not grant individuals license to make untrue allegations, unduly inflammatory statements or unduly personal attacks, or to harass others, to violate confidentiality requirements, or engage in other conduct that violates the law or University policy.

Doc. 3-3 at 2.

Shortly after the presidential election in November of 2012, Hunt posted the following statement on his personal Facebook page:

All right, I've had it. To all of you who support the Democratic candidates:
The Republican Party sucks. But guess what. Your party and your candidates
parade their depraved belief in legal child murder around with pride.

Disgusting, immoral, and horrific. Don't celebrate Obama's victory tonight, you
sick, disgusting people. You're abhorrent.

Shame on you for supporting the genocide against the unborn. If you think gay
marriage or the economy or taxes or whatever else is more important than this,
you're fucking ridiculous.

You're WORSE than the Germans during WW2. Many of them acted from honest
patriotism. Many of them turned a blind eye to the genocide against the Jews. Bur
you're celebrating it. Supporting it. Proudly proclaiming it. You are a disgrace to
the name of human.

So, sincerely, fuck you, Moloch worshipping assholes.

Doc. 3-1. The Facebook post was not directed at any individual, nor did it contain any reference

to UNM or UNMSOM. Doc. 15-1 at 1 ¶ 6.

On November 15, 2012, Defendant Scott Carroll, M.D. ("Carroll") wrote a letter to Hunt

informing him that the Dean of Students had formally referred Hunt to the Committee for

Student Performance and Evaluation ("CSPE"). The referral stemmed from allegations of

unprofessional conduct made by other students against Hunt arising from his Facebook post.

Doc. 3-2 at 9. In the letter, Carroll stated, "[w]hile you have every right to your political and

moral opinions and beliefs, there is still a professionalism standard that must be maintained as a

member of the UNM medical school community." *Id*. Carroll then quoted from the UNM

Respectful Campus Policy that states, "the right to address issues of concern does not grant

individuals license to make untrue allegations, unduly inflammatory statements or unduly

personal attacks, or to harass others . . ." *Id*. Finally, the letter informed Hunt that "CSPE will be

conducting an investigation into the allegations at its November 20th meeting at 3pm [sic] and

we would like you to prepare a statement regarding the allegations and be prepared to answer questions from the committee members."

On November 20, 2012, Hunt appeared before the CSPE, where he recognized members of the NMSOM faculty, as well as some fellow students. Doc. 15-1 at 4, ¶ 17. He read a prepared statement acknowledging his "guilt" and asking for help. *Id*. at ¶ 18. Then he answered questions from members of the CSPE. *Id*. at 4.

On January 24, 2013, Carroll again wrote to Hunt informing him that after the November 20th meeting, the CSPE "substantiated that [Hunt's] Facebook post was in fact unprofessional conduct due to violations of the UNM Respectful Campus Policy (2240) and the UNM School of Medicine Social Media Policy. Doc. 15-1 at 11. Carroll told Hunt that he would be given a two-part "professional enhancement prescription." *Id*. The first, focusing on ethics, involved mentorship by a faculty member who would "assign readings and supervise a reflective writing assignment on patient autonomy and tolerance." *Id*. The second, focused on professionalism, was comprised of four parts: (1) a reflective writing assignment on the public expression of political beliefs by physicians, (2) an apology letter, which Hunt could present to anyone of his choice, or no one at all, (3) rewriting the Facebook post in a passionate, yet professionally appropriate way, and (4) ongoing meetings with Dr. Tim Nelson over a one-year period. *Id*. Next, the letter informed Hunt that the professionalism violation would be noted in the recommendation letter the Dean would provide to residency training programs, but that in the future Hunt could petition CSPE to remove the notation. *Id*. The letter stated the further professionalism lapses or failure to fulfill any of the professionalism requirements described in the letter could result in adverse action, including dismissal from the UNMSOM. *Id*. at 11-12. Finally, Carroll's letter quoted the UNMSOM Promotions and Due Process Policy, informing Hunt that if he believed the CSPE's

decision imposing corrective action was flawed, he could request in writing that the Senior Associate Dean of Education review the decision. *Id*. at 12. Hunt did not utilize the review process. Doc. 3-2 at 2, ¶ 5.

Over the next twelve months, Hunt met with his "professionalism mentor," Dr. Nelson, twelve times as prescribed in the January 24, 2013 letter. Doc. 15-1 at 5, ¶ 25. In addition, Hunt rewrote his Facebook post as required by CSPE; however, it rejected his first attempt. *Id*. at ¶ 29; Doc. 15-1 at 12 (Ex. D). However, the CSPE accepted Hunt's second rewrite. Doc. 15-1 at 6, ¶ 30; Doc. 15-1 at 14 (Ex. E). The second rewrite still expresses Hunt's fervent opposition to abortion, but the tone of the piece is calm and rational, and it contains no expletives.

On April 22, 2014, Defendant Carroll notified Hunt that his professionalism enhancement prescription was completed but that "any future reports of unprofessional behavior to CSPE will be considered in light of your previous lapse in professionalism." Doc. 15-1 at ¶ 31; Doc. 15-1 at 16 (Ex. F). Dr. Carroll also noted, "If you would like this notation removed from your Dean's letter, you will need to submit a written petition to CSPE requesting its removal at a future date." *Id*.

On January 15, 2016, Plaintiff Paul Hunt ("Hunt") filed his First Amended Complaint in the Second Judicial District Court, Bernalillo County, New Mexico. In Counts I, II, and III of his amended complaint, Hunt asserts claims for violation of his First Amendment rights (freedom of speech, viewpoint discrimination, and retaliation, respectively). In Count IV, Hunt asserts that his Fourteenth Amendment right to due process was violated. Hunt asserts the first four counts against the UNM Board of Regents, unnamed CSPE members, and Carroll pursuant to 42 U.S.C. § 1983. Count V does not assert a cause of action, but rather contains a request for declaratory judgment and injunctive relief against the Board of Regents, Defendant Teresa Vigil, M.D.

("Vigil"), and Defendant Paul Roth, M.D. ("Roth"), presumably as a remedy for the causes of action set forth in the first four counts. Specifically, Hunt asks for a declaration that his constitutional rights have been violated and an injunction requiring Vigil, as the current interim chair of the CSPE, to recommend to Roth, as Dean of the School of Medicine, to remove all references to the Facebook matter from Hunt's permanent record. Doc. 1-1 at ¶ 57. Similarly, in Count VI Hunt does not assert a cause of action but requests another remedy: imposition of punitive damages against unnamed CSPE members and Carroll.

On April 8, 2016, the Defendants removed the case to this federal district court, asserting federal question jurisdiction under 28 U.S.C. § 1331.

## LEGAL STANDARD

Defendants have filed their motion as one to dismiss for failure to state a claim under Fed. R. Civ. Pro. 12(b)(6), or in the alternative for summary judgment under Fed. R. Civ. Pro. 56.

"A motion to dismiss pursuant to Rule 12(b)(6) is treated as a motion for summary judgment when premised on materials outside the pleadings, and the opposing party is afforded the same notice and opportunity to respond as provided in Rule 56." *Hall v. Bellmon*, 935 F.2d 1106, 1110-11 (10th Cir. 1991). Here, Defendants have attached to their motion and asked the Court to consider affidavits, university policies, and other matters outside the pleadings. Hunt, in turn, has done the same in his response brief. Accordingly, the Court will treat the motion as one for summary judgment under Rule 56.

Summary judgment should be granted "if the movant shows that there is no genuine issues as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the non-moving party bears the burden of proof, as here, summary judgment

is warranted by demonstration of an absence of facts to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When qualified immunity is involved, "a defendant asserts a qualified immunity defense" then "the burden shifts to the plaintiff, who must meet a heavy two-part burden." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)). The plaintiff first must establish that "the officer's conduct violated a constitutional right," and then the plaintiff must show that "the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

## DISCUSSION

I.  **Constitutional Claims Against the Board of Regents and the Individual Defendants In Their Official Capacities**

Section 1983 provides a claim for relief against "any person who, under color of state law, deprives another of rights protected by the Constitution." *Ellis ex rel. Estate of Ellis v. Ogden City*, 589 F.3d 1099, 1101 (10th Cir. 2009). Defendants argue that Hunt's claims for money damages for alleged violations of his constitutional rights under 42 U.S.C. § 1983 against the Board of Regents and the individual defendants in their official capacities should be dismissed. The Court agrees. As the Tenth Circuit and Supreme Court have made clear, "Neither states nor state officers sued in their official capacity are 'persons' subject to suit under section 1983." *Duncan v. Gunter*, 15 F.3d 989, 991 (10th Cir. 1994) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989)). Hunt therefore may not seek damages from the Board of Regents or the individual defendants in their official capacities, and those claims will be dismissed. State officers sued in their individual capacities, however, "are 'persons' subject to suit under section 1983." *Duncan*, 15 F.3d at 991. Accordingly, the Court will consider Hunt's

claims against the individual defendants in their individual capacities for both monetary and injunctive relief.

While Hunt recognizes the unavailability of damages against the Board of Regents and the individual defendants in their official capacities, he contends that he may still seek injunctive and declaratory relief from the Board of Regents. Defendants, in turn, argue that because Hunt has not named the individual regents in his amended complaint, he has failed to state a claim against a person covered by Section 1983.[1] The Court agrees with Defendants. Hunt has not named any individual members of the Board of Regents, but rather only the Board itself. As explained above, the Board of Regents is an entity, not a "person" that may be held liable under Section 1983. *See McLaughlin v. Board of Trustees of State Colleges of Colorado*, 215 F.3d 1168, 1172 (10th Cir. 2000) ("Having sued only the Board rather than the individual trustees, Mr. McLaughlin has failed to state a claim against a person covered by section 1983."). Accordingly, the Board of Regents is not subject to suit under § 1983, and Hunt's claims against the Board of Regents for injunctive and declaratory relief will be dismissed for failure to state a claim.

As a result of the foregoing discussion, what remains are Hunt's § 1983 claims in Counts I through IV against Carroll, Vigil, and Roth in their individual capacities.[2] As previously discussed, Counts V and VI do not assert causes of action, but rather request particular remedies.

---

[1] Both sides recognize that, having agreed to the removal of the case to federal district court, the Board of Regents has waived its Eleventh Amendment immunity to suit in this Court.

[2] According to the First Amended Complaint [Doc. 1-1], Hunt asserts his first four counts against "Board of Regents, CSPE members, and Scott Carroll, M.D." Hunt alleges that Defendant Vigil "is the interim chair of the CSPE," *Id*. at 4, ¶ 5, and therefore the complaint can reasonably be read to assert his constitutional claims in Counts I through IV against her. According to the First Amended Complaint, Defendant Roth is the Dean of the UNMSOM, that he "has the ultimate authority to remove all references to the Facebook mater from Plaintiff's academic record," and

## II.   First Amendment Claims Against Defendants In Their Individual Capacities

As explained above, the Defendants have raised the defense of qualified immunity. As a result, Defendants have shifted the burden to Hunt to demonstrate that Defendants violated his First Amendment (freedom of speech) and Fourteenth Amendment (due process) rights, and that those rights were clearly established at the time of the violation. Courts have discretion to decide the order in which to engage in the two-prong qualified immunity analysis. *Tolan v. Cotton*, —— U.S. ——, 134 S. Ct. 1861, 1866 (2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here, the Court exercises its discretion to address only the clearly established prong of the standard as to the First Amendment claim. The issue before the Court is whether—assuming Carroll violated Hunt's First Amendment right to post on Facebook by subjecting him to discipline—this right was clearly established in late 2012 and in 2013, when that discipline was imposed. As discussed below, the Court finds an absence of controlling authority that specifically prohibits Carroll's conduct.

### A.   Clearly Established Law

Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. ——,  136 S. Ct. 305, 308 (2015). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, immunity protects "'all

---

that he is a named defendant because "he has the ability to provide prospective injunctive relief for Plaintiff." *Id.* at ¶ 6. Thus, it not clear that Hunt is asserting his constitutional claims against Roth in his individual capacity. However, the parties do not address this question in their briefs. Resolution of this issue not being essential to the resolution of the motion, the Court will not address it here.

but the plainly incompetent or those who knowingly violate the law.'" *Id*. The Supreme Court very recently reminded us,

> Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case. Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

*White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal citations and quotations omitted).

### B.    Analysis

To the Court's knowledge, at the time of the disciplinary action at issue in this case, neither the Supreme Court nor the Tenth Circuit had considered whether graduate and professional schools specifically (or universities generally) can regulate off-campus, online speech by students that the university deems to be unprofessional or which violate its applicable rules of professionalism. Hunt has not provided any such authority to the Court, nor has the Court been able to locate any such authority.[3] Rather, Hunt contends that at the time it was clearly established that the Supreme Court's opinion in *Tinker v. Des Moines Ind. Cnty. Sch. Dist.*, 393 U.S. 503 (1969) prohibits Carroll's conduct in this case. The Court disagrees with Hunt's analysis.

#### 1.    *Tinker* and Its Progeny Do Not Apply Here

In *Tinker*, the plaintiffs were high school and middle school students who planned to wear black armbands to express their hostility to the Vietnam war and their support for a truce.

---

[3] November of 2012 is the relevant time frame regarding the clearly established law in this case. It appears that the U.S. District Court for the District of Kansas, which encountered a similar issue, also failed to find controlling Tenth Circuit or Supreme Court authority during the 2013-2014 time frame. *See Yeasin v. Durham*, 224 F.Supp.3d 1194, 1202 (D. Kan. 2016) ("[N]either the Supreme Court nor a panel of the Tenth Circuit has considered whether universities can regulate off-campus, online speech by students.").

*Id*. at 504. The principals at the plaintiffs' schools learned of the plan and in response adopted a policy prohibiting the armbands. *Id*. Included in the policy was a provision that any student who refused to remove a black armband would be suspended until he or she returned without it. *Id*. Despite knowing the policy, the plaintiffs wore their armbands to school and were suspended accordingly. *Id*. The Supreme Court found that the plaintiffs' First Amendment rights had been violated. *Id*. at 513-14. The Court noted that a student's First Amendment rights are not limited to the classroom or to school hours, but that student speech which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id*. at 513. The school authorities in *Tinker* failed to show facts that might have reasonably led them to believe that wearing the armbands would lead to substantial disruption of school activities, or that any such disruption actually occurred. *Id*. at 514. Thus, the school officials' restraint of the plaintiffs' expression violated the constitution. *Id*.

Hunt contends that it is *Tinker*'s "substantial disruption" standard that applies in this case. Doc. 15 at 8, 12, 21. He contends that because his off-campus, online speech did not cause disruption at UNMSOM, Carroll was not entitled to regulate that speech. In support of that argument, he relies on two Tenth Circuit decisions, *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996) and *Taylor v. Roswell Ind. Sch. Dist.*, 713 F.3d 25, 35-36 (10th Cir. 2013). In *Seamons*, the plaintiff was a high school student who was assaulted by five of his football teammates in the locker room. *Id*. at 1230. They grabbed him as he came out of the shower and bound his naked body, including his genitals, to a towel rack with adhesive tape. *Id*. The plaintiff reported this assault to school administrators, the principal, and the football coach, who then accused him of "betraying the team by bringing the incident to the attention of the

administration" and requiring him to apologize to the team. *Id*. When he refused, the coach

dismissed the plaintiff from the team. *Id*. The teenager asserted that the school officials violated

his First Amendment right to freedom of speech by discouraging him from making statements to

the press about the incident, and by removing him from the football team because he refused to

apologize for informing authorities of the incident. *Id*. at 1236. Relying on *Tinker*, the court

concluded that the plaintiff had properly stated a claim for violation of the First Amendment and

that the school officials were not entitled to qualified immunity:

> Brian's speech was responsibly tailored to the audience of school administrators,
> coaches, family and participants who needed to know about the incident. Brian's
> behavior neither disrupted classwork nor invaded the rights of other students. His
> speech was not part of a school-sponsored expressive activity such that listeners
> might believe that Brian's speech had the imprimatur of school sponsorship. We
> simply see no overriding school interest in denying Brian the ability to report
> physical assaults in the locker room. At most, the school's interest here was based
> on its fear of a disturbance stemming from the disapproval associated with Brian's
> unpopular viewpoint regarding hazing in the school's locker rooms. Under *Tinker*,
> that is not a sufficient justification to punish Brian's speech in these
> circumstances.

*Id*. at 1238.

Like *Seamons*, *Taylor* also took place in a high school setting. There, students sued the

school district and superintendent alleging that school officials violated their First and Fourteenth

Amendment rights by preventing them from distributing 2,500 rubber fetus dolls to other

students. They also challenged the school district's policies requiring preapproval before

distributing any non-school-sponsored material on school grounds. *Taylor*, 713 F.3d at 29. The

defendants presented evidence that the plaintiffs had distributed about 300 of the dolls before

they were stopped, and that the dolls had created significant disruption at the school. *Id*. at 30-31.

The Tenth Circuit noted that "this case does not turn on whether the content of Plaintiffs'

message warrants First Amendment protection—there is no question that it does. The record

shows Plaintiffs meant to convey a religious and political message when they distributed the rubber dolls, and the Constitution requires they be permitted to express these views at school in some form." *Id*. at 35. However, citing *Tinker* (which the court noted applies to "student speech in public schools"), *id*., the court concluded that the plaintiffs' free speech challenges failed because school officials reasonably forecasted that the distribution would cause substantial disruption, and because the distribution did in fact cause substantial disruption. *Id*. at 35, 38. The Tenth Circuit distinguished the distribution of the dolls from the "silent, passive expression that merely provokes discussion in the hallway" that a school could not properly prohibit under *Tinker*. *Id*. at 37. It further held that plaintiffs' free exercise and equal protection claims failed because the decision to stop the distribution was not based on religion, and plaintiffs failed to show they were treated differently from similarly situated students. *Id*. at 54.

*Tinker*, *Seamons*, and *Taylor* all address the free speech rights of secondary school students on school grounds, during school hours, or relating to a school activity. These cases do not fit in the context presented here, which is online speech by a university, graduate, or professional school student which is alleged to violate the school's rules of professionalism. Although law in this arena has been developing, the Court cannot conclude that it was clearly established at the time the Defendants acted in this case.

### 2. Cases Addressing the Type of First Amendment Claim Presented By Hunt Were Not Clearly Established at the Relevant Time

A government official violates clearly established law when the contours of a right at the time of the challenged conduct are sufficiently clear so that a "reasonable official would understand that what he is doing violates that right." *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (quoting *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013)). A plaintiff may establish this prong "by identifying an on-point Supreme Court or published Tenth

Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.' " *Cox v. Glanz*, 800 F3d 1231, 1247 (10th Cir. 2015) (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)). When the clearly established requirement is "properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Most recently, the Supreme Court, in *Mullenix v. Luna*, explained that "[t]he dispositive question 'is whether the violative nature of particular conduct is clearly established.' This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " 136 S.Ct. 305, 308 (2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001))). It must have been clear to a reasonable person in Defendant's position "that [their] conduct was unlawful in the situation [they] confronted." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014).

There have been a few cases dealing with the right to regulate online speech by university or professional school students in an effort to enforce professional standards or university policies, though none are Supreme Court or Tenth Circuit cases that had been published prior to late 2012 or in 2013, the relevant time period in this case. Thus, they cannot be used to demonstrate "clearly established law" within the meaning of a qualified immunity analysis.

In one recent Eighth Circuit case, a nursing student made statements on his personal Facebook page that another student found threatening. *Keefe v. Adams*, 840 F.3d 523, 526 (8th Cir. 2016). The student talked about his anger issues, giving someone a hemopneumothorax (a trauma to the lung), and called another student a "stupid bitch" for reporting his posts. *Id*. at 527. After reading the posts, the schools Director of Nursing became concerned and addressed the issue with Keefe, who was not receptive to her concern that the posts were unprofessional and

attempted to downplay them as jokes. *Id*. In the face of Keefe's inability to recognize that his posts were unprofessional, the Director of Nursing decided to remove Keefe from the program and told him that he could appeal the decision. *Id*. She cited his violations of the nursing program's handbook, which stated that "students who fail to meet the moral, ethical, or professional behavioral standards of the nursing program are not eligible to progress in the nursing program," and that these included "transgression of professional boundaries" and "behavior unbecoming of the Nursing Profession." *Id*. at 528. Further, the court noted that the Nurse's Association Code of Ethics "precludes any and all forms of prejudicial actions, any form of harassment or threatening behavior, or disregard for the effect of one's actions on others." *Id*.

The Eighth Circuit rejected Keefe's First Amendment claim. It noted that "many courts have upheld enforcement of academy requirements of professionalism and fitness, particularly for a program training licensed medical professionals. Fitness to practice as a health care professional goes beyond satisfactory performance of academic course work." *Id*. at 530. Thus, given the strong state interest in regulating the health professions, the Eight Circuit held that "teaching and enforcing viewpoint-neutral professional codes of ethics are a legitimate part of a professional school's curriculum that do not, at least on their face, run afoul of the First Amendment." *Id*. Furthermore, the court observed that a student may demonstrate an unacceptable lack of professionalism not only by conduct, but also by speech—including online speech. Administrators in a professional school may require compliance with applicable professionalism standards, even for off-campus activities, so long as their actions are reasonably related to pedagogical concerns. *Id*. at 531.

*Yeasin v. Durham*, 224 F. Supp. 3d 1194 (D. Kan. 2016)—a case arising from within the Tenth Circuit—is one in which a university punished a student for off-campus speech. Plaintiff

Yeasin dated a fellow university student until the summer of 2013, when their relationship ended with a consent protection order prohibiting Yeasin from having any contact with his former girlfriend. *Id*. at 1199. Over a period of four months, Yeasin sent out fourteen Tweets that referenced but did not name his ex-girlfriend. That fall, she complained to the university that the tweets violated the no-contact order, and it agreed, warning him via email that any further violation might result in his expulsion. *Id*. In October of 2013, the university determined that Yeasin had sexually harassed his ex-girlfriend and had violated the Student Code of Conduct. After a formal hearing, the university found that Yeasin "had committed non-academic misconduct based on the June 2013 incident, the threatening statements made to [his ex-girlfriend], the tweets, and violation of the No Contact Letter." *Id*. at 1200. Finding Yeasin's conduct to be so severe, pervasive, and offensive that it interfered with his ex-girlfriend's education, the university expelled him and banned him from campus. The *Yeasin* court considered whether the defendant, a university official, was entitled to qualified immunity on Yeasin's claim that his expulsion for Twitter posts violated his First Amendment rights.

The court pointed out that not only do colleges have a legitimate interest in preventing disruption on the campus, the Tenth Circuit and other Federal Circuit Courts of Appeals had found that less rigorous student-speech standards apply to college students. *Id*. at 1202 (citing *Keefe*, *supra*, and *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1286-90 (10th Cir. 2004). In finding that the law in this area was not clearly established in 2013, the *Yeasin* court stated:

> The law in this area is constantly developing, and when Plaintiff was expelled in 2013, it was even more unclear what standards applied. This case can hardly be categorized as a clear case of a content-based restriction in violation of the First Amendment. Most importantly, circuit courts have come to conflicting conclusions on whether a school can regulate off-campus, online student speech where such speech could foreseeably cause a material disruption to the administration of the school. The Tenth Circuit has not addressed off-campus, online student speech at the public school or university level.

224 F. Supp. 3d at 1202-03.

The lack of on-point legal authority that formed the basis of qualified immunity in *Yeasin* also persists here. During the period of late 2012 and into 2013, when Carroll and other members of the CSPE imposed corrective action on Hunt, there was no clearly established law prohibiting their actions. Defendants found that the inflammatory nature of Hunt's Facebook post violated university policies and as a result they imposed additional training requirements and required him to rewrite the post to express the same viewpoint , but in a more professional manner. They also made a notation of the incident in Hunt's file. What precludes a finding that Carroll violated clearly established due process rights is the lack of prior decisions classifying reprimands of professional students as academic or disciplinary, and the lack of uniformity in the decisions that do exist. There was no controlling authority in this Circuit or a "consensus of cases of persuasive authority" in others on which the Defendants could have relied to determine whether they should be held to the standards of disciplinary, as opposed to academic, dismissals. *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Officials are not liable for bad guesses in gray areas.

The absence of controlling authority that specifically prohibited Carroll's conduct is dispositive. The motion for summary judgment on the basis of qualified immunity will be granted.

III. **Fourteenth Amendment Procedural Due Process Claim Against Defendants In Their Individual Capacities**

Hunt also argues that the Defendants imposed discipline upon him in violation of his right to procedural due process. He alleges that the Board of Regents (now dismissed, as discussed in Part I, *supra*), CSPE members (who are not named individually as defendants in this case), and Defendant Carroll "failed to provide any guidelines as to appropriate standards for the

hearing, or for the sanctions which were imposed on Plaintiff." Doc. 1-1 at ¶ 53. He further alleges that he was not informed he was entitled to be represented at the hearing, and that his "due process rights were violated because he was subjected to arbitrary and capricious government action, without notice of what standards were in effect." *Id*. at ¶ 54. He contends that UNMSOM's policies "were vague, and contained no notice of the consequences of violating the policies." *Id*. The Court interprets this to be a claim that Carroll violated Hunt's right to procedural due process. After reviewing the law and the summary judgment evidence, the Court concludes that Hunt has failed to demonstrate that Carroll violated his constitutional due process rights, and therefore he is entitled to qualified immunity.

There are cases addressing the discipline of students and the process to be afforded them. In *Goss v. Lopez*, 419 U.S. 565, 581 (1975), the Supreme Court addressed the academic suspension of students, holding that even a short disciplinary suspension requires that the student "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." In *Bd. Of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 80-82 (1978), a student was dismissed from medical school following extensive review by a Council on Evaluation in accordance with established university procedures that did not include a pre-dismissal hearing. The student argued that procedural due process also required "the fundamental safeguards of representation by counsel, confrontation, and cross examination of witnesses." *Id*. at 86 n.2. The Court agreed that the university's elaborate procedures had complied with the procedural requirements of *Goss*. *Id*. at 85. The Court further noted that "far less stringent procedural requirements" apply to an "academic" dismissal. *Id*. at 86. This dicta addressed a reality that did not affect the Court's procedural due process decision in *Horowitz*—that academic dismissals, though accompanied by

extensive procedural safeguards, often do not include a pre-dismissal face-to-face hearing between the student and academic decision-makers.

The Court notes that, unlike in the cases above, the discipline that UNMSOM imposed upon Hunt did not extend to the level of a suspension or a dismissal. UNMSOM's "Due Process Policy and Procedure," [Doc. 16-1], distinguishes between "adverse actions," which may include dismissal, suspension, or repetition of all or part of the curriculum. *Id*. at Doc. 16-1, p. 1 of 6. Conversely, "corrective actions" are less serious and include "requiring a student to take a specified course, … monitoring a student more closely by placement on a 'watch' list, assigning an academic advisor with whom the student is required to meet and requiring a contract in which the student agrees to take certain actions in order to continue in medical school." *Id*. Under this policy, it appears that UNMSOM imposed a corrective action upon Hunt. The policy further provides that while adverse actions may be appealed, corrective actions such as those imposed upon Hunt may not but rather upon the student's request may be reviewed by the Senior Associate Dean of Education. *Id.* and *id*. at p.5 of 6. Hunt did not request this review.

As the Supreme Court has stated, due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quotation omitted). When conduct that leads to an adverse academic decision is of a disciplinary nature, due process may require the procedural protections of *Goss v. Lopez* in determining whether the student was guilty of the misconduct in question. In this case, the Court concludes that Hunt, like the student in *Horowitz*, was "awarded at least as much due process as the Fourteenth Amendment requires." 435 U.S. at 85, 98 S.Ct. 948. First, Hunt was given written notice of the charges against him. Carroll's November 15, 2012 letter to Hunt informed him that his Facebook post regarding abortion and the election had resulted in complaints of

unprofessional conduct from Hunt's fellow students. Carroll's letter quoted from the UNM Respectful Campus Policy that states, "the right to address issues of concern does not grant individuals license to make untrue allegations, unduly inflammatory statements or unduly personal attacks, or to harass others . . ." *Id*. It also quoted from the Respectful Campus Policy. Finally, the letter informed Hunt that "CSPE will be conducting an investigation into the allegations at its November 20th meeting at 3pm [sic] and we would like you to prepare a statement regarding the allegations and be prepared to answer questions from the committee members." Thus, Hunt was informed in writing of the allegations against him, as well as the basis for those allegations, and the campus policies that he was alleged to have violated. Second, Hunt was given a hearing where he had an opportunity to present his side of the story and to make his own position clear. On November 20, 2012, Hunt appeared before the CSPE, where he recognized members of the NMSOM faculty, as well as some fellow students. Doc. 15-1 at 4, ¶ 17. He read a prepared statement acknowledging his "guilt" and asking for help. *Id*. at ¶ 18. Then he answered questions from members of the CSPE. *Id*. at 4.

Under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985), *Goss*, and *Horowitz*, this was all the process that was due to Hunt. *See Loudermill*, 470 U.S. at 546 (concluding that procedural due process entitles one to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."). Thus, there was no violation of Hunt's constitutional right to due process, and Carroll is entitled to qualified immunity.[4]

___

[4] Hunt also contends, at the conclusion of his argument regarding procedural due process, that he was discriminated against and punished based upon the *content* of his Facebook post, rather than for violation of any university policy. Doc. 15 at 29. In support of his argument, Hunt attaches copies of Facebook posts allegedly made by other UNMSOM students who he asserts also

## CONCLUSION

In light of the foregoing, the Court concludes that Defendants are entitled to summary judgment on all of Hunt's claims against them. As explained above, the Board of Regents is an entity, not a "person" that may be held liable under Section 1983. Similarly, state officers sued in their official capacities are not "persons" subject to suit under section 1983. Defendant Carroll in his individual capacity is entitled to qualified immunity on Hunt's First Amendment claims because the law was not clearly established. In addition, Carroll is entitled to qualified immunity on Hunt's procedural due process claim because Hunt failed to demonstrate that his due process rights were violated. Finally, because Defendants prevailed on Hunt's substantive claims, Hunt cannot assert a right against Defendants Vigil and Roth for injunctive or declaratory relief, nor against Carroll for punitive damages. Defendants' motion will be granted.

---

violated university policies but were not punished by the university. None of those posts contains opinions in opposition to abortion, unlike Hunt's original post. *See* Doc. 15-2 at p. 1-5.

As a preliminary matter, the Court is not certain how this argument regarding content discrimination relates to Hunt's claim for a violation of procedural due process. However, leaving aside the specific legal claim to which it relates, a claim of content discrimination must show that a similarly situated person was treated differently than Hunt based on the content of their speech. *See, e.g., Pahls v.Thomas*, 718 F.3d 1210, 1238 (10th Cir. 2013) ("[P]urposeful discrimination requires more than intent as awareness of consequences. It follows, under this standard, that if the evidence shows only that a defendant is aware of disparate treatment of two similarly situated groups—but nothing more—then a § 1983 or Bivens claim for viewpoint discrimination must fail as a matter of law.") (internal citations and quotations omitted). For a plaintiff to succeed, there must be additional evidence—direct or circumstantial—that the defendant acted "for the purpose of discriminating on account of" viewpoint. *Ashcraft v. Iqbal*, 556 U.S. 662, 677 (2009).

Assuming for the sake of argument that the cited Facebook posts from other UNMSOM students did violate the Respectful Campus Policy or the Social Media Policy, just as Hunt's allegedly did, then Hunt might be able to prove a prima facie case of viewpoint discrimination if he offered evidence that UNMSOM knew about those posts but failed to address them. However, Hunt comes forward with no evidence that any complaints about the cited posts were ever made to UNMSOM or that Carroll or any other university official knew about the posts. In the absence of evidence that any official at UNMSOM knew about the posts, they cannot be held liable for failing to address them in the same manner that they addressed Hunt's Facebook post.

**IT IS THEREFORE ORDERED** that *Defendants' Motion to Dismiss or for Summary Judgment* [Doc. 3] is hereby **GRANTED** in its entirety.

_____
**UNITED STATES DISTRICT JUDGE**